COMMONWEALTH vs. MICHAEL MARPLE.

No. 87-666.

Norfolk. April 19, 1988. — June 28, 1988.

Present: DREBEN, KAPLAN, & FINE, JJ.

Homicide. Evidence, Prior conviction, Declaration against interest. Witness, Impeachment. Practice, Criminal, Discovery, Instructions to jury. Joint Enterprise.

There was no merit to the contention of a criminal defendant charged with murdering a fellow inmate while incarcerated at M.C.I., Cedar Junction, that his constitutional rights were infringed when the trial judge declined to give rulings in advance on the use by the Commonwealth of prior convictions to impeach defense witnesses, where the witnesses were prison inmates whose status as such was bound to be known by the jury. [155-156]

At a murder trial, the judge committed no error in denying the defendant's broad request for discovery of all statements, taken from inmates of the prison in which the homicide occurred, that could be used to impeach the defendant's inmate witnesses, nor was material error shown with respect to the statement of a certain inmate witness, where the defendant did not make a specific request for the inmate's statement before calling him as a witness, and where, in any event, the witness, confronted with his statement by the Commonwealth on cross-examination, denied he had said what the statement recorded and asserted it was false. [156-157]

At a murder trial no error appeared in the exclusion from evidence of two hearsay statements that allegedly incriminated the declarant and exonerated the defendant where the defendant failed to bring forward corroborating circumstances that clearly indicated the trustworthiness of the statements. [157-159]

At a murder trial, no error appeared in the judge's instructions to the jury on joint enterprise, nor in his discussion of manslaughter to provide a contrast with and setting for his instruction on murder, nor in a certain prefatory remark that could be taken as no more than a "literary flourish." [160-161]

INDICTMENT found and returned in the Superior Court Department on September 24, 1984.

The case was tried before *John Paul Sullivan,* J.

*Barry P. Wilson* (*Maxine Sushelsky* with him) for the defendant.

*James F. Lang,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.  Michael Marple and Stephen Haynes, inmates at M.C.I., Cedar Junction, were indicted by a Norfolk County grand jury for the murder of John Blais, also an inmate, alleged to have been committed on April 13, 1984. Trial was to be joint. Just before jury impanelment, the trial judge accepted Haynes's *Alford* plea of guilty to the lesser crime of manslaughter. See *North Carolina* v. *Alford,* 400 U.S. 25, 38 n.11 (1970). Trial proceeded in the defendant Marple's case, and at the end the judge left to the jury whether to convict of either of the degrees of murder or to acquit. (The defendant preferred not to leave to the jury any question of a manslaughter verdict.) The jury brought in a verdict of murder in the second degree, and from the judgment of conviction the defendant takes his appeal.

We give a condensed account of the case, which will provide background for the defendant's points of law.

Just before 7:05 P.M. on April 13, 1984, the body of John Blais was found sprawled on the steps leading upward from a landing between the second and third tiers of a rear stairway in the Bristol 1 cell block at Cedar Junction. A "code 99" alarm sounded at 7:05 which ordered all inmates back to their cells and brought a paramedical team promptly to the scene. We have the observations of Timothy Gagnon, one of the team, and Dr. George Katsas, a forensic pathologist, who later performed an autopsy. In short, the victim had been severely beaten and strangled to death with a garrotte of some cloth fabric. There was considerable letting of blood; smears and traces appeared on the landing and on the upward steps and the adjacent walls.

Correction Officer Samuel Wigfall, upon hearing the alarm, dashed to the rear stairwell of Bristol 1 and ran up the stairs, past Blais's body (the medics had not yet arrived), to the third-tier landing. He saw the defendant Marple entering his cell 60,

near the stairwell. The defendant said, "What's wrong with that guy? Is he all right?" And, "Hey, I know that guy. Is he all right? Can I see him?" At 7:55 Wigfall was assigned to shake down cell 60. Also at the alarm, Correction Officer Anthony Williams, from another direction, reached the front stairwell of Bristol 1 and ran up the stairs to the third tier. He saw Haynes washing himself in the shower room opposite the stairwell. Despite the alarm and an order by Williams to leave, Haynes remained there for some forty-five to sixty seconds. Williams escorted Haynes to his cell 58 nearby. Williams was assigned to shake down cell 58.

Combining the testimony of Wigfall, Williams, and Robert Sullivan, the latter a forensic chemist who started his work in Bristol 1 in the late evening of April 13, we have evidence that a number of items in cell 60 and also in cell 58 carried stains testing positive for human blood, grouping "AB" (a sample stain from the stairs was also AB). This is a rare blood grouping (four percent of the population) to which the victim belonged: both the defendant Marple and Haynes fell in the common "O" grouping. Thus, for cell 60, stains on a bedpost and a towel (wet when Wigfall found it) tested AB; other items carried human blood, the sink and toilet occult blood, which could not be grouped. For cell 58, a white pillowcase and blue shirt, taken from a large cardboard box beneath the bed, tested AB; there was occult blood, not grouped, on the window handle, sink, and toilet.[1] A trooper, Robert Murphy, arriving about 8:30 P.M., April 13, to investigate the homicide, reconnoitered the ground adjacent to Bristol 1. To the rear of the building, below cell 60, he found a bed sheet, sneakers, and a part of a torn towel, all with blood (on Sullivan's examination) testing AB; and below cell 58, a sponge, a full towel, and the other part of the torn towel, all testing AB.

Robert Akers had begun to serve a sentence at Cedar Junction a few days before the homicide. Some three days after the event he came forward and spoke to the orientation teacher,

---

[1] The record at one point suggests that the occult blood in both cells did test AB, but this may be passed over.

Diane Watson, and subsequently to Lieutenant McCrosson and others. As a new inmate, he was housed in the "day room" (a recreational room) in Bristol 1. Having left the room on April 13 at a time not clearly fixed — he mentioned the time around 5:30 as well as a period shortly before 7:00—he was proceeding up the rear stairway intending to go to the cell of an inmate known to him only as "Curt" or "Curtis" to claim four packs of cigarettes for a dungaree jacket he had previously traded to "Curt." From a position on the stairs below, he said he saw two men on the landing between the second and third tiers assaulting a thickly bearded man, the victim Blais. The larger of the two men, whom he identified as the defendant Marple, was holding Blais by the throat and beating him on the side of the head with a stick or pipe. The defendant was saying, "Where's the ludes" [quaaludes]? As the victim was thrown to the ground, Akers turned and went down the stairs. Akers said he resolved to go to the authorities after being terrified by threats — that something might happen to him because of what he had seen on the stairs — uttered by an inmate (whom he later identified from photographs).[2]

It remains to mention the defendant's statement. Trooper Murphy, after inspecting the grounds, had a talk with the defendant (first telling him that blood had appeared in his cell and informing him of his Miranda rights). The defendant said he and Blais had been in cell 60 smoking joints. Haynes was also there. Blais asked the defendant whether he wanted to play· chess. The defendant told Blais to get a "hot pot" and cigarettes. Blais left, Haynes went to the cell of one Sarge Lee, and he, the defendant, went to the shower. Twenty minutes later (evidently near the time of the alarm) the defendant returned and saw Blais lying on the stairs.

So much for the evidence when the Commonwealth rested. On his part, the defendant presented as witnesses four inmates

---

[2] Akers' testimony was attacked on cross-examination. Apart from his uncertainty about the time of the encounter, he is found writing to the judge who sentenced him intimating a change of his sentence as reward for telling his story. There was doubt about Akers' statement that, following the threat, he stayed for protection on the telephone near a guard's station a lengthy period of time during the night.

testifying to the whereabouts of the defendant. Like the defendant, Haynes, and Blais, the witnesses Kurt Brown and Patrick O'Shea were Bristol 1 "runners," that is, inmates who did cleaning chores in the block outside their cells during the period when the general population were locked in for a "count."[3] We may take it that a count began about 5:30 P.M. on April 13, and ended about 6:30 P.M. Cleaning duties took about fifteen minutes, then Brown (who denied being the "Curt" who allegedly had a transaction with Akers) went to the day room with the defendant and O'Shea. Brown and O'Shea remained in that room through the alarm. The defendant, said Brown, left the room at some point, returned in ten to fifteen minutes, and left again five minutes or less before the alarm. According to O'Shea, the defendant was in the day room "almost the whole time"; indeed, "I don't recall him leaving." John MacNeill, locked in his Bristol 1 cell during the count, stayed on there for some minutes, then used the telephone, and entered the day room a few minutes before the alarm. He saw Brown, O'Shea, and the defendant and presumed, though he could not be sure, that the defendant was still in the room at the alarm. Joseph Messere said he remained in his third-tier cell for fifteen minutes after the lockup for the count, encountered the body of Blais as he descended the rear stairway but went on without pause to the cell of David Williams, spoke with Williams, went to Darrell Hall's cell but missed him, went to the day room where he saw Hall and the defendant, then returned to Williams' cell, and shortly afterward was locked in at the alarm.

It will be seen that the testimony of the inmates was at odds with the defendant's own statement or at best in questionable or indifferent consistency with it. On the whole case a jury could well find that the defendant, in complicity with Haynes, accomplished the death of Blais by beating him, starting probably in cell 60, then along the stairway and landing, and at

---

[3] At some point during the count of the inmates locked in their cells, runners are counted outside. We do not know when the runners' count occurred. The practice tends to suggest that Blais was alive for some part at least of the period of the general count.

some point choking him with the ligature.[4] Counsel does not quarrel with the verdict in its substance.

1. Defense counsel moved in limine for advance rulings by the judge as to the putative use by the Commonwealth of prior convictions to impeach the inmate witnesses who would be called by the defense (counsel, however, did not indicate, when he made the motion, who specifically would be called). The judge declined to give advance rulings and indicated that he would rule as the individual witnesses were called and occasion arose. It is worth noting that this was not a question of using prior convictions to impeach a defendant testifying in his own behalf; it seems counsel had no design to call the defendant Marple. Even with regard to a defendant-witness, it has been held that a judge has a discretion whether to make an anticipatory decision or to abide the event, see *Commonwealth* v. *King*, 391 Mass. 691, 695 (1984), although the possible advantages of early assurance have been set forth, see *Commonwealth* v. *Diaz*, 383 Mass. 73, 81 (1981), and situations where that procedure would be highly desirable can readily be pictured. In the case of an ordinary witness, the advantages will typically be less evident, if indeed present at all. Where the witness is an inmate of a prison and his status as such is bound to be known to the jury, the whole question whether to deal ahead of time with the use of convictions becomes little short of trivial. See *King*, 391 Mass. at 695 n.2. Counsel's contention, that the defendant in such an instance suffers deprivation of a constitutional right when decision is postponed, appears quite untenable. Cf. *Commonwealth* v. *Fano*, 400 Mass. 296, 301 (1987).[5] In the present case the defendant did not challenge the propriety of the prosecution's impeachment of the inmate witnesses by their criminal records

---

[4] The defendant suggests, however, that he and Blais were friendly, that Haynes got into an altercation with Blais in the defendant's cell while the defendant was in the shower, strangled Blais, dragged him down the stairs and abandoned him there, and returned to the defendant's cell and attempted to clean it up before himself going to the shower.

[5] *Rock* v. *Arkansas*, 483 U.S. 44 (1987), cited by the defendant, deals with a problem arising from hypnotic treatment of a defendant and throws no light on the issue here.

when this occurred in cross-examination and chose to decline to have the judge instruct the jury about the limited inferences that could be legitimately drawn from such impeachment.

2. By a second threshold motion, counsel asked to be furnished by way of discovery with the statements of inmates concerning the homicide: the IPS (a police service acting within the prison) had interviewed the inmates and taken statements from those willing to give them.[6] Bristol 1 cell block had seventy-two single cells on the three tiers, to which must be added perhaps nine places for new inmates in the day room; we do not know how many statements were recorded. The Commonwealth objected to wholesale discovery on the ground that there might be unnecessary disclosure of material that could create tension in the institution. Denying the broad discovery, the judge, after himself examining the statements in camera, assured counsel that these had the inmates denying knowledge of the incident and saying nothing of an exculpatory nature. Counsel, however, said the statements might have a content that could be used by the Commonwealth to impeach inmates who might be offered by the defense as witnesses. No particular inmates were named.

After Kurt Brown testified on direct examination for the defense, the Commonwealth referred to a statement given by Brown that apparently was inconsistent with his account of remaining in the day room.[7] Counsel pointed to the discrepancy as showing that the judge had committed error in denying the threshold motion and leaving the defense in ignorance of Brown's statement. The prosecutor told the judge he in fact had supplied counsel with Brown's statement when Brown was called; counsel said he received the statement only after the cross-examination. This difference was not resolved. The weakness in counsel's position, however, is that, when he decided to call Brown, he failed to make a specific request for any

---

[6] Such discovery would not be mandatory under Mass.R.Crim.P. 14(a)(1), 378 Mass. 874 (1979), but might be ordered by the judge under rule 14(a)(2).

[7] According to the statement, Brown was sorting mail, obtaining and cooking spaghetti in someone's cell, and eating dinner in another cell, when by his testimony he was in the day room.

statement by Brown held by the Commonwealth. That the judge would have been amenable to a specific request is shown by his direction to the prosecutor to furnish any statements of the other inmates to be called (Messere had given a statement).

At all events, there is little to suggest that the contretemps about Brown was material error if it was error at all. The defense called Messere although his statement was disclosed and he was impeached by it; probably the defense would have been similarly uninhibited in the case of Brown. Brown in fact when confronted with his statement (see n.7) denied he had said what it recorded and asserted the statement was false.[8]

3. The defense offered two inmates in Bristol 1, Albert J. Blake and Anthony P. Puckett, who were to follow Messere on the witness stand and testify about alleged statements by Haynes incriminating himself and exonerating the defendant. As the statements were hearsay, they were inadmissible unless the defense could qualify them affirmatively as declarations "against penal interest" within Rule 804(b)(3) of the Federal Rules of Evidence,[9] adopted in substance as the law of the Commonwealth. See *Commonwealth* v. *Carr*, 373 Mass. 617, 623-624 (1977). The judge duly conducted a voir dire, with the two witnesses being taken in direct and cross-examination. Blake would testify that in June, 1985, when he, Haynes, and Marple resided in cell block 10, he encountered Haynes in the

---

[8] For situations of undisclosed statements rather more serious for defendants where nevertheless material error was not found, see, e.g., *Commonwealth* v. *Gilbert,* 377 Mass. 887, 892-893 (1979); *Commonwealth* v. *Cundriff,* 382 Mass. 137, 148-150 (1980), cert. denied, 451 U.S. 973 (1981).

[9] Rule 804 provides: "(b) *Hearsay exceptions.* — The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: . . . (3) *Statement against interest.* — A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

exercise yard. He asked Haynes, whom he knew back in 1979 or 1980, how things looked. Haynes said things didn't look good, the only thing he could look forward to was a manslaughter reduction; he felt bad for Marple, Marple had nothing to do with it. Blake did not tell Marple of his conversation with Haynes at the time. He, Puckett, and Marple were now in cell block 9, and he told Marple three weeks before the date of his present testimony at voir dire. Puckett, who had known Haynes, would testify that in the second or third week of September, 1985, he, Haynes, and Marple resided in block 9. He met Haynes in the exercise yard. He inquired about the case and what Marple had to do with it. Haynes said it was a personal "beef" between John Blais and himself, Marple had nothing to do with it, he just got caught in the middle. Puckett did not inform Marple about the conversation until three weeks before the date of the voir dire when Haynes, said Puckett, pleaded to manslaughter. Until then, he said, to tell about the conversation would have been to "rat" on Haynes.

The judge discussed the law and held that the defense had not brought the Blake or Puckett hearsay testimony within the exception. The judge was right. The prosecution does not dispute that Haynes could be regarded as "unavailable." [10] However, it is at least doubtful whether Haynes's statement (to track the words of the rule) "so far tended to subject [him] to . . . criminal liability . . . that a reasonable person in [his] position would not have made the statement unless believing it to be true"; and it is rather plain that the defense failed to bring forward "corroborating circumstances" which "clearly indicate[d] the trustworthiness of the statement."

On the former point, since Haynes is reported as thinking that his case was lost and he could hope for no more than a sentence for manslaughter, he could lie about Marple's participation, which involved his admitting his own guilt, without doing himself any particular harm. But it is the knowing accept-

---

[10] Although Haynes had pleaded on the *Alford* basis, it was assumed he might in his testimony incriminate himself of other crimes. See *United States* v. *Zirpolo,* 704 F.2d 23, 25 (1st Cir.), cert. denied, 464 U.S. 822 (1983).

ance by a declarant of likely harm to himself through making a statement that tends to make the statement worthy of belief. See *Commonwealth* v. *Carr*, 373 Mass. at 623.

As to corroborating circumstances, a rundown of factors mentioned in *Commonwealth* v. *Drew*, 397 Mass. 65, 76 (1986), and other authority shows a distinct deficit. The character and reliability of the declarant were suspect.[11] The alleged statements were not contemporaneous with the homicide or the defendant's indictment; they came more than a year after the incident and were reported to the defendant nearly two years later.[12] The statements were not spontaneous but were elicited by questions.[13] They were confided to friendly or sympathetic associates, not to any indifferent audience,[14] and, although there was repetition, the two hearers can be seen as belonging to the same coterie.[15] The statements themselves provided no detail toward exculpating the defendant, and the evidence in the case apart from the proposed hearsay indicated strongly that the blanket exonerating assertions were false:[16] in light of the evidence one could hardly credit that the defendant had "nothing to do with it." The *Drew* case reminds us that corroboration must "clearly indicate" trustworthiness, but, where it is a close question whether the standard has been met, the statement should be admitted. 397 Mass. at 75 n.10. Here there was no close approach to satisfaction of the standard.[17]

---

[11] See *United States* v. *MacDonald,* 688 F.2d 224, 233 (4th Cir. 1982), cert. denied, 459 U.S. 1103 (1983).

[12] See *Commonwealth* v. *Drew,* 397 Mass. at 77.

[13] Compare *United States* v. *Thomas,* 571 F.2d 285, 289 (5th Cir. 1978).

[14] See *United States* v. *Bagley,* 537 F.2d 162, 165 (5th Cir. 1976), cert. denied, 429 U.S. 1075 (1977). McCormick, Evidence § 278, at 823 (3d ed. 1984).

[15] Compare *Commonwealth* v. *Drew,* 397 Mass. at 77; *United States* v. *Ospina,* 739 F.2d 448, 452 (9th Cir.), cert. denied, 469 U.S. 887 (1984). But cf. *Commonwealth* v. *Keizer,* 377 Mass. 264, 271 (1979).

[16] See *United States* v. *Silverstein,* 732 F.2d 1338, 1347 (7th Cir. 1984), cert. denied, 469 U.S. 1111 (1985).

[17] The credibility or lack of it of the proffered witnesses (as distinguished from the declarant) may not figure in the judge's assessment of "corroborating circumstances"; that is for the jury if the witnesses are allowed to testify to

4. The judge instructed the jury with regard to the defendant's responsibility not only as an individual offender, but also as a putative coventurer in a joint enterprise to commit murder. Although the defendant did not object at the time, on the appeal he seeks to claim error in the judge's omission to charge that an accessory must share with the principal the state of mind intrinsic to the crime. See *Commonwealth* v. *Richards*, 363 Mass. 299, 307-308 (1973). The judge, after speaking of other required elements, indicated quite plainly that the defendant, to be held guilty on a joint enterprise basis, must, if the charge be murder in the first degree, have himself premeditated with malice aforethought. (On a charge of second degree murder, the required mental state would of course differ.) Compare *Commonwealth* v. *Dyer* 389 Mass. 677, 683-684 (1983).

The defendant now complains, although he did not make the objection below, that the judge should have charged, also in connection with joint enterprise, that to be found guilty the defendant must have apprehended, if he did not himself possess the ligature, that the other person had it. This specific finding can be required where use of a given instrument is a necessary element of a particular crime, e.g., a weapon in armed robbery. See *Commonwealth* v. *Watson,* 388 Mass. 536, 544 (1983). Where the crime charged is simply murder, the requisite shared state of mind of the malice can be proved in any suitable way, not limited to proof of knowledge of a particular weapon. Thus, the jury here, from all the circumstances, could infer the defendant's malice, without reference to a ligature, from, among other things, the defendant's participation in the severe beating of the victim Blais. Compare, on significantly different facts, *Commonwealth* v. *Hennessey,* 17 Mass. App. Ct. 160, 165 (1983).

The defendant objected that the effect of the judge's charge was to urge upon the jury that they find a culpable joint enterprise. On the contrary, the judge repeatedly stated that fact-finding was for the jury and on the facts he, as judge, stood indifferent. At counsel's request he said, in an additional

---

the hearsay. See *Commonwealth* v. *Drew,* 397 Mass. at 76 n.11. Still, we may speculate on how the jury would size up credibility if the witnesses had in fact testified. The jury would likely have thought the testimony to be a fabrication. A telltale point is that Puckett would say he told the defendant about the conversation with Haynes when, three weeks before the date of the voir dire, he learned Haynes had pleaded. Blake also mentioned three weeks. In fact Haynes had not pleaded until a week before voir dire. This would bespeak a collaborative invention based on faulty communication. The similarity of the stories of Puckett and Blake in other respects would also be suggestive.

Commonwealth *v.* Marple.

charge, that this applied to the question whether there was a joint enterprise.[18]

5. As noted, the defendant chose not to put to the jury the possibility of a manslaughter verdict. He complained that the instructions nevertheless dealt at length with manslaughter. The jury would understand that what was said on that subject was intended to provide a contrast with, and setting for, the discussion of murder, which was the question for their verdict.

6. Commencing his instructions, the judge spoke of the history of the institution of the jury and then mentioned an essay by G. K. Chesterton describing the author's experience as a juror. Chesterton wrote that as the jury received the case and entered the jury room "it seemed as if the Holy Ghost descended upon us." The defendant objected and invokes the separation of church and state but we think the jury would take the remark as a literary flourish and nothing more.

*Judgment affirmed.*

---

[18] A slip of the tongue in the additional charge, where the judge said of the fact-finding, "That's my function and please don't think it is," would surely be corrected by the hearer to supply the word "not."