COMMONWEALTH *vs.* FREDERICK WEICHELL.

Norfolk. April 4, 2006. - May 22, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* New trial. *Evidence,* Exculpatory, Hearsay, Declaration against interest.

Discussion of the well-established principles governing a motion for a new trial based on newly discovered evidence. [798-799]

This court did not reach a claim that a criminal defendant had waived his right to a new trial based on newly discovered evidence by not asserting the issue in a previous motion for a new trial. [799]

The judge hearing a criminal defendant's motion for a new trial erred in concluding that the defendant had satisfied his burden of establishing that the evidence supporting his motion was newly discovered, and that the evidence was not reasonably discoverable by the defendant or his counsel at the time of trial or his first motion for a new trial, where, with regard to a letter written by a third party claiming that the defendant was innocent, the defendant had it within his means to ascertain the contents of the letter long before he filed his present motion but deliberately did not do so, and the defendant did not suffer from any recognized psychological syndrome, or other mental impairment, that prevented him from pursuing that potentially exculpatory evidence [799-801]; and where, with regard to alleged incriminating verbal statements made by a third party, the defendant should have realized during his trial that the Commonwealth considered that third party a suspect, and the defendant, who knew the person to whom the third party made the alleged incriminating statements, had to make no more effort than to ask her, before filing his first motion for a new trial, whether the third party had said anything about the crime in question [801-802].

The judge hearing a criminal defendant's motion for a new trial based on newly discovered evidence erred in concluding that the evidence supporting his motion, consisting of a letter written by a third party claiming that the defendant was innocent and alleged incriminating verbal statements made by the same third party, was admissible under the exception to the hearsay rule for statements against penal interest, where the statements lacked trustworthiness and were not adequately corroborated. [802-806]

INDICTMENT found and returned in the Superior Court Department on February 23, 1981.

A motion for a new trial, filed on January 23, 2002, was heard by *Isaac Borenstein,* J.

*Robert C. Cosgrove*, Assistant District Attorney, for the Commonwealth.

*Carol A. Fitzsimmons* for the defendant.

GREANEY, J. Although James J. Bulger, Jr. (alias "Whitey"), has long evaded the grasp of pursuing domestic and international law enforcement officers seeking to bring him to account for crimes too numerous and too craven to be summarized here, his malevolent tentacles have once again reached into the Commonwealth and have led to the grant of a motion for a new trial for the defendant, Frederick Weichell, who was convicted by a jury of murder in the first degree and whose conviction was affirmed by this court in *Commonwealth* v. *Weichell*, 390 Mass. 62 (1983), cert. denied, 465 U.S. 1032 (1984). The ground for the grant of the new trial motion is encapsulated in the bizarre circumstances that we shall describe below (material worthy of a crime novella). The circumstances persuaded the judge (not the trial judge, who had retired) that the defendant had happened on newly discovered evidence that called the validity of his conviction into question. We disagree with the judge's conclusion and vacate the order granting the defendant a new trial.

1. (a) The background of the case is set forth in our opinion in *Commonwealth* v. *Weichell, supra* at 65-67, as follows: "*The shooting*. [The victim, Robert W. LaMonica,] worked for the Boston Water and Sewer Commission. He worked from 4 P.M. to midnight. He would usually drive straight home from his job to his [Braintree] apartment, customarily arriving there between 12:15 A.M. and 12:30 A.M. He would turn off Faxon Street to park his [automobile] in a parking lot adjacent to his apartment building. Faxon Park is across from the entrance to the parking lot. [The victim] followed this routine on the morning of May 31, 1980. He parked and got out of his [automobile]. Four shots were fired, two of them hitting [the victim]. A bullet entered through his neck and penetrated the brain. A second bullet entered his back and lodged in his right rib cage. [The victim] died in the parking lot.

"*Identification*. Shortly before midnight on May 30, 1980, John Foley, Jean Castonquay, Frederick Laracy, and Lisa Krause went to Faxon Park, after attending a drive-in movie together.

Foley testified the group had been drinking and that he had consumed four or five beers during the movies. At 12:15 A.M., Foley was walking away from a wooded area of the park. He heard four 'bangs' and saw a man run out of the parking lot and turn up Faxon Street to a waiting [automobile]. Krause screamed. The man looked toward the group briefly but continued running. Foley testified that he had a full-face view of the man for approximately one second as the man passed under a street light. Foley and Laracy went across Faxon Street to the parking lot where they found the body of the victim on the ground. The police arrived shortly thereafter.

"Foley described to the police the man he saw running as being five feet, nine inches tall, 175 pounds, wearing jeans and a pullover shirt. [At the time of his arrest, the defendant was five feet, seven inches tall, and weighed 155 pounds.] He said that the man had dark curly hair, bushy eyebrows, and sideburns. He also stated that the man had a slightly crooked nose, 'as if it had been broken.' At trial, he identified the defendant as the man he saw running that night.

"Later that morning, Foley assisted Detective Wilson of the Braintree police department in making a composite drawing. After indicating that he could not draw a face by himself, Foley gave Wilson a general description. With the aid of an Identikit, Wilson and Foley assembled a composite. Foley examined the composite and asked for changes. Wilson then changed elements of the composite and put together a different face. Wilson used a pencil to alter the nose. After Foley altered the hair style, he declared that the composite 'looks like him.' A photostatic copy of the composite was introduced in evidence at trial.

"The next day, Foley was shown an array of nine photographs. He picked the defendant's picture as 'a pretty good likeness' of the man. Several months later, he again identified the defendant's photograph out of the same array but which now included one additional photograph.

"On June 12, 1980, two State troopers, Foley, and the victim's two brothers drove through the streets of South Boston in a van. The [two brothers] gave directions, but did not speak to Foley. Eventually, Foley picked, out of a group of young men, an individual whom he thought was the man he saw running. The

van was driven around the corner and passed the group for a second time. Foley stated, 'That's the guy.' A State trooper took a photograph of the individual which was introduced in evidence and identified as a photograph of the defendant.

"Jean Castonquay also testified that she heard four shots and saw a man running. At trial, she was unable to say whether the defendant was the man she saw. Moments later, she tentatively identified another person sitting in the back of the courtroom as the man [the victim's brother]. On three occasions Castonquay was shown the same array of photographs as Foley, but was unable to pick out any one photograph. Instead, she picked out two or three photographs each time, always including that of the defendant. Neither Laracy nor Krause made any identification."[1]

"Other evidence offered by the Commonwealth was admitted to create an inference that the defendant was conscious of his guilt. After the shooting, but before his arrest, the defendant asked Francis Shea and Dennis King [whose connection with the defendant and the victim is explained below] if the police were looking for him." *Id.* at 67 n.4.

On the issue of motive, the Commonwealth submitted evidence that in the weeks preceding the victim's death, the defendant and his friend, Thomas Barrett, had a series of confrontations, some involving physical altercations and threats, with Shea and Shea's friends, which included the victim, King, and Chuckie Carr. *Id.* at 64-65.

We summarized the defendant's case in *Commonwealth* v. *Weichell, supra* at 67-68, as follows: "At trial, the defendant's counsel [Anthony M. Cardinale], through cross-examination, attempted to bring out whatever discrepancies existed in Foley's testimony. He emphasized that Foley had indicated that the man he saw running had thick sideburns and bushy eyebrows. Foley admitted, however, that the defendant's eyebrows were different. It also appears that the defendant did not have any sideburns. Despite some evidence to the contrary, the jury could have concluded that the defendant had curly hair at the time of the

---

[1] At a pretrial suppression hearing, Lisa Krause testified that after hearing gunshots, she saw a man run to an automobile parked on the street. The man opened the passenger side door of the automobile, jumped in, and the automobile "took off."

murder. The defendant also attempted to show that the lighting in the area was poor [evidence to the contrary was proffered by the Commonwealth] and that the identification process was unreliable. The defendant did not testify.

"The defendant also sought to establish a defense of alibi. Three witnesses testified on his behalf. One witness's testimony [Kevin McCormack[2]] placed the defendant in downtown Boston until midnight. The other witnesses [Leo Mahoney and Kevin J. Weeks[3]] placed the defendant at the Triple O Lounge in South Boston at, or shortly after, the time of the shooting."

We then pointed out that, "[i]n rebuttal, the Commonwealth introduced evidence that the defendant could have left downtown Boston shortly before midnight and driven to [the victim's] apartment by the time of the shooting. A trip to the Triple O Lounge from the victim's apartment would have taken only another fifteen or twenty minutes. The Commonwealth also attacked the credibility of the two witnesses who placed him at the Triple O Lounge. Both were long-time friends of the defendant, and one [Mahoney] was engaged to Thomas Barrett's sister. The other witness [Weeks] failed to explain why he never came forward until one week before the trial." *Id.* at 68.

The defendant was represented by his trial counsel in his direct appeal. *Id.* at 63. In affirming the defendant's conviction, we rejected his claims that "the trial judge erred in (1) denying his motions in limine to exclude certain evidence relating to motive; (2) granting the Commonwealth's motion in limine to exclude evidence which tended to show that third parties had a motive to commit the crime; (3) refusing to exclude a 'mugshot' photograph of the defendant's profile; (4) permitting the Commonwealth to introduce in evidence a composite drawing; (5) allowing the Commonwealth to introduce in evidence an enlarged copy of a photograph of the defendant taken by the Braintree police at the time of his arrest; and (6) excluding photographs of the scene of the crime and the testimony of the

[2]Kevin McCormack owned a restaurant, The Exchange, in the financial district in downtown Boston.

[3]Leo Mahoney was a long-time friend of the defendant, and Kevin J. Weeks was the night manager at the Triple O Lounge and had known the defendant for approximately five years.

photographer who took them." *Id.* We also denied relief under G. L. c. 278, § 33E. *Id.* at 64.

(b) In August, 1991, the defendant, represented by new counsel, filed a motion for a new trial arguing that his trial counsel had deprived him of his right to testify. The trial judge denied the motion without a hearing. A single justice of this court, acting under the gatekeeper provision of G. L. c. 278, § 33E, did not permit the defendant to appeal from this order.

(c) Over a decade later, in January, 2002, the defendant, represented by his current counsel, filed his second motion for a new trial, which is before us. The motion was based on alleged newly discovered evidence and ineffective assistance of trial and appellate counsel. The alleged newly discovered evidence consisted of a confession letter authored by the defendant's colleague Barrett, and evidence corroborating the defendant's alibi and exculpating him.[4] With respect to his ineffective assistance of counsel claim, the defendant argued that his appellate counsel should have raised a claim of ineffective assistance of trial counsel predicated on trial counsel's failure to (1) challenge the reliability and credibility of the composite drawing of the defendant at trial; (2) properly investigate; (3) utilize previous false testimony and an investigative report of State Trooper John R. Sprague, the primary investigator of the shooting; and (4) request a jury instruction on good faith mistaken identification.

The judge concluded that the alleged newly discovered evidence concerning the defendant's alibi (hearsay statements attributed to Special Agent John Connolly of the Federal Bureau of Investigation [FBI] and Bulger) was not newly discovered because the statements previously had been reasonably discoverable. The judge also explained that the evidence consisted of hearsay and was cumulative of evidence at trial. The judge rejected the defendant's ineffective assistance of counsel claim,

---

[4]This evidence consisted essentially of hearsay statements attributed to former Special Agent John Connolly of the Federal Bureau of Investigation (FBI) to the effect that Connolly was present and saw the defendant at The Exchange at the time of the victim's murder; and hearsay statements attributed to Bulger in which Bulger allegedly directed Connolly to keep quiet about seeing the defendant at The Exchange and stated to another that the defendant had not been involved in the murder.

noting that the defendant waived his right to raise the issues underlying the claim and that the issues did not create a substantial risk of a miscarriage of justice. The defendant has not appealed from the order containing these rulings.

With respect to the alleged newly discovered evidence in the form of Barrett's confession letter, the judge ruled that the defendant had satisfied his initial burden of showing the existence of a substantial issue thereby necessitating an evidentiary hearing. The judge emphasized, "[t]here shall not be any hearing on any other claims."

The judge proceeded to conduct an evidentiary hearing in keeping with the foregoing rulings. In addition to presenting evidence concerning Barrett's confession letter, set forth below,[5] the defendant presented evidence of incriminating statements Barrett allegedly made to Sherry Robb, a friend of the defendant with whom Barrett had lived periodically in California in the 1980's.[6]

The judge's findings of fact recounted the testimony of the various witnesses at the evidentiary hearing. Where the judge specifically made certain findings or found certain evidence to be credible, it is so noted. The judge's findings are as follows.

During the lifetime of the defendant's deceased mother, Gloria Weichel (Weichel),[7] she spoke periodically over the telephone with her sister, Lorrie Doddie, who lived in Michigan.

---

[5]The letter, addressed to the defendant's mother, stated:

"Dear Gloria, I really don't know what to say! So I will get straight to the point. I haven't had a good night sleep in almost a year because I know [the defendant] did not kill [the victim]. I did! Yes, Gloria I killed [the victim]. [The defendant] has known this. I told him a couple weeks after it happened! Gloria, I never thought in a million years that they would blame and convict a[n] innocent man. Gloria, I am so sorry for all of the pain I put you and [the defendant] through. I can't let [the defendant] spend the rest of his life in jail for something he didn't do! So, Gloria, if there is *ANYTHING* I can do to help clear [the defendant] please let me know. Gloria, I mean anything at all." (Emphasis in original.) The letter was signed "Tommy Barrett"; was dated March 19, 1982; bore a Mill Valley, California, return address; and bore a California postmark dated March 19, 1982.

[6]This latter category of evidence first surfaced at the evidentiary hearing during the testimony of Thomas Barrett's mother.

[7]This appears to be the correct spelling of her surname. In our decisions we spelled the defendant's name as it appeared in the indictment. The defendant's mother died in January, 2000.

Sometime in 1982 or 1983, Weichel telephoned Doddie and read her Barrett's confession letter. Weichel stated she had received the letter from a friend of the defendant's and that it appeared to have originated in California.[8] Weichel told Doddie that after she had received the letter, two men (unknown to her) came to her home in the South Boston area of Boston, asking for the letter, but she had not given it to them. The judge found Doddie's testimony credible and found that Weichel had expressed fear to Doddie about the letter and the two men who had visited her.

Sometime in 1990, Weichel gave Barrett's confession letter to Francis Hurley, an attorney and acquaintance of the defendant's family. Hurley would hold letters and other documents for people he knew, often without being aware of the contents. Unaware of the contents of the Barrett confession letter, Hurley kept the letter locked up until after Weichel's death. In 2001 or 2002, the defendant's friend, Donald J. Lewis, contacted Hurley. Hurley did not learn the contents of the letter until after he received the defendant's permission to provide copies of the letter to Lewis and to Jonathan Wells, a Boston Herald reporter. Hurley then delivered the original letter in its envelope to the defendant's current attorney in August, 2001.

Lewis, who was paying a portion of the defendant's legal fees, learned sometime in 2000 that Hurley was holding a letter for the by then deceased Weichel.[9] Lewis recalled that the defendant had been speaking with Wells. The defendant told Lewis that the letter "may have information to convince Wells that he was, [the defendant] was innocent." At the direction of

[8]Contrary to the defendant's counsel's representation at oral argument that Barrett wrote and communicated with the defendant's mother, the defendant testified at the hearing on the motion for new trial that his mother and Barrett were not friendly and Barrett's confession letter was the only letter that Barrett wrote to his mother.

[9]The judge's findings state that Lewis learned in 2001 or 2002 that Hurley was holding a letter, but the record indicates that the year was 2000. Considering that Hurley made a copy of the letter for Lewis prior to delivering the original to the defendant's attorney in August, 2001, Lewis's knowledge of the letter could not have first come in the year 2002. In addition to testifying that he learned of the letter's existence in 2000, he also testified that this information came about after the defendant's mother had died (in January, 2000).

the defendant's attorney, after she had received the original letter, Lewis delivered the original envelope and letter to the defendant's handwriting expert.

The defendant testified that Bulger and Stephen Flemmi (alias "The Rifleman") approached him about four times prior to his arrest, and once after his arrest, while he was awaiting trial and had been released on bail. Bulger told the defendant at one meeting, "I do not want you to bring up Tommy Barrett's name ever." Bulger threatened to harm the defendant or his family should he disregard the warning. The defendant understood that the visit was intended to ensure that he never spoke of Barrett.

The judge considered the positions of Bulger and Flemmi "relevant here; they were leaders of gangs that operated largely in South Boston during the 1970's and 1980's. Bulger and Flemmi operated gambling rackets and trafficked in narcotics and weapons. Neither party disputes that Bulger and Flemmi were ruthless killers who used fear, intimidation, coercion, threats, and murder to hold the community of South Boston hostage. Their gangs worked with virtual impunity as the FBI protected and even aided Bulger, a confidential informant for the FBI. In the mid-1990's Bulger fled authorities and remains at-large. Bulger has previously sat atop the FBI's most wanted list and remains on it currently. Flemmi is incarcerated and has assisted investigators in locating the bodies of people that he, Bulger, and their associates murdered."

Around 1982, the defendant's mother informed him that she had received a letter from Barrett that year declaring the defendant's innocence. In view of Bulger's threats, the defendant stopped his mother before she divulged the actual contents of the specific letter to him. The defendant did not inquire or learn of the contents of the letter until 2001, after his mother's death and after Bulger had become a fugitive from justice.

Barrett took the witness stand at the evidentiary hearing and invoked his right under the Fifth Amendment to the United States Constitution not to incriminate himself. Based on the testimony of the defendant's handwriting expert, the judge found that Barrett had authored the March 19, 1982, confession letter

to the defendant's mother.[10] Robb, who originally was from California, worked in the South Boston area in the early to mid-1970's. During that time, Robb knew the defendant (and had a romantic relationship with him in the late 1970's or early 1980's), and was familiar with Barrett. In the summer or early fall of 1980, the defendant made a telephone call to Robb, who had moved back to California, and told her that Barrett was in trouble. The defendant asked her if Barrett could stay with her because Barrett had to get out of South Boston. Robb agreed and Barrett arrived at her home in Sausalito shortly thereafter.[11]

Barrett stayed with Robb and her roommate over the next two to three months. Later, after one and one-half years had passed, Barrett again stayed with Robb, this time in Mill Valley, for a two to three week period. Robb remained in contact with Barrett through the 1980's, and even lived with him for six months in a house that Barrett's mother and Robb owned in Larchmont. When their cohabitation in Larchmont terminated, Robb never saw or heard from Barrett again.

Robb was not aware that Barrett had written to the defendant's mother. She did not recall giving Barrett her address. She did not recognize the handwriting on the envelope of the letter (the writing was not Robb's). Robb did not know if Barrett was in touch with the defendant or with the defendant's mother while Barrett was in Sausalito and Mill Valley.

During the 1980's, Robb and her mother maintained relationships with the defendant. Robb corresponded with the defendant five or six times per year, with the frequency decreasing in recent years. Occasionally, the defendant would telephone Robb. During those conversations, Barrett's name surfaced, and the defendant never cut short the conversation when Barrett was the topic of conversation. Until her death, Robb's mother regularly corresponded with the defendant and often kept Robb informed of his status.

Over the course of many in-person and telephone conversa-

---

[10]The Commonwealth essentially conceded below that the letter was in Barrett's handwriting.

[11]Members of Barrett's family testified that he moved to California after the defendant's trial and conviction. Barrett wrote to his mother and made occasional telephone calls to her.

tions, Barrett told Robb that he wanted to kill himself because "someone was taking the rap for something that he had done." Barrett also told Robb that the defendant had been wrongly accused and that Barrett had in fact killed someone. Robb testified that she "pieced it together" that Barrett had committed the crime for which the defendant was convicted and incarcerated. Robb urged Barrett to do "the right thing," but never discussed the topic with anyone else. Only once, after the defendant had been in prison for "awhile," did she reference Barrett's statements with the defendant by asking, "How could a friend not come forth?" The judge expressly credited Robb's testimony.

Trooper Sprague, the lead State police detective who investigated the victim's shooting, indicated that the working theory of the case was that two men, the defendant and Barrett, had killed the victim. Sprague was involved in a "sting operation" to discover evidence linking Barrett to the victim's murder. With court authorization, State police and local investigators put a wiretap on Barrett's telephone, as well as a listening device in the defendant's automobile for a twenty-four hour period to intercept conversations between the defendant and Barrett. No evidence was obtained.

State police Sergeant Kevin P. Shea interviewed Robb on July 23, 2003. Robb told him that while intoxicated by drugs and alcohol, Barrett had told her that he wanted to kill himself because the defendant was doing time for him. Robb also told Sergeant Shea that she had been in a coma for four days in 1993 as a result of Graves' disease, and that the coma had impaired her memory.

Sydney Hanlon, the former assistant district attorney who represented the Commonwealth at the defendant's trial (and who now is a Boston Municipal Court judge), testified that the working theory of the case was that two men had committed the murder: the defendant as the shooter and Barrett as the getaway driver. Hanlon had participated in the wiretap of Barrett's telephone, and she testified that Barrett once telephoned the defendant, stating, "Pick up the phone, pick up the phone Freddy, they're coming." All discovery, including police reports that described the working theory of the case, were given to the

defendant's trial counsel before trial. Further, Hanlon had discussed the joint venture theory with the defendant's trial attorney, and the theory was mentioned in submissions to the court.

Against this factual background, the judge found the following: "I find the defendant's testimony that he was unaware of the contents of the letter to be credible. Although the defendant knew of the letter's existence for over twenty years prior to his filing a motion for a new trial, he did not know the letter's import.[12] The backdrop of South Boston provides the context which buttresses [the defendant's] credibility. The defendant was accused of murder and received five visits from Bulger and Flemmi. During those visits, Bulger made it abundantly clear that Tommy Barrett was a name that [the defendant] was not to utter. The force behind Bulger's admonition derived from his reputation for ruthlessness and violence earned by terrorizing the South Boston community. Bulger's threats were not empty.

"When Gloria Weichel approached her son with news of a letter written by Barrett, [the defendant] did not want to discuss it. It is fair to infer that at the time Gloria Weichel told her son about the letter, Bulger's threats to him were fresh; [the defendant] had been convicted of murder just months earlier. Bulger's words would have been at the peak of their potency, given that [the defendant] had only been incarcerated for a few months. It is credible that [the defendant] would not have inquired about the contents of the letter at that point, and that he did not do so until 2001."

The judge went on to address Barrett's confession letter and Barrett's incriminating verbal statements to Robb. The judge first noted that there was no question that the defendant did not know about the letter until after trial. The judge found that when the defendant learned of the letter, he did not know the letter's contents. The judge explained that the issue remaining was whether the defendant reasonably could have discovered the exculpatory content of the letter. The judge analogized the

---

[12]Given the judge's conclusions, he must have credited the defendant's testimony that, contrary to what Barrett claimed in his confession letter, the defendant was never told by Barrett in the weeks following the victim's murder that he (Barrett) had murdered the victim.

circumstances to those in *Commonwealth* v. *Pike*, 431 Mass. 212, 222 (2000), in which a judge's order denying a defendant's motion for a new trial based on newly discovered evidence of battered woman syndrome was affirmed, but in which the court held that, in appropriate cases, evidence of battered woman syndrome may constitute newly discovered evidence because characteristic of the condition is an inability of a woman to perceive herself as abused or to gain help by communicating abuse to others. The judge concluded, based on Bulger's threats and the "fear and intimidation" that the defendant "faced at the hands of Bulger and Flemmi," it was reasonable for the defendant to fear for his safety and his family's safety and "decide not to uncover the content contained in Barrett's letter."

The judge next determined that Barrett's verbal statements to Robb that he had killed the victim also constituted newly discovered evidence. The judge reasoned: "[The defendant's] counsel on his motion for a new trial did not discover that Robb had information relating to the defendant's case until after the evidentiary hearing had begun, and there is no evidence that [the defendant] had any reason to believe that Robb possessed exculpatory evidence."

The judge recognized that Barrett's confession letter and Barrett's verbal statements to Robb constituted hearsay, but concluded that the evidence would be admissible under the exception to the hearsay rule for statements against penal interest. The judge focused on the corroboration requirement of that exception, namely that "the statement [against penal interest], if offered to exculpate the accused, must be corroborated by circumstances clearly indicating its trustworthiness." *Commonwealth* v. *Drew*, 397 Mass. 65, 73 (1986), quoting *United States* v. *Thomas*, 571 F.2d 285, 288 (5th Cir. 1978). After reviewing the circumstances in which Barrett made his statements, the judge stated that the totality of circumstances "clearly show that Barrett had little to gain and much to lose by confessing to the [victim's] murder . . . . Given the unlikeliness that Barrett would fabricate a story and risk criminal liability by twice repeating it to two people who were loyal to the defendant, I find that sufficient corroboration merits the admissibility of Barrett's confessions."

Finally, the judge concluded that the defendant had satisfied his burden of showing that the newly discovered evidence cast real doubt on the justice of his conviction. The judge noted that while there was sufficient evidence to warrant the jury's verdict convicting the defendant, the case against him did not have overwhelming evidence of guilt, but was based principally on one witness's (Foley's) identification. The judge noted that each type of newly discovered evidence (the letter or the verbal statements to Robb) by itself would be "enough to merit a new trial," but that "the evidence together provides particular strength to its weight." We turn now to the merits of the appeal.

2. The well-established principles governing a motion for a new trial based on newly discovered evidence are set forth in *Commonwealth* v. *Grace*, 397 Mass. 303, 305-306 (1986):

> "A defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction. . . . The evidence said to be new not only must be material and credible . . . but also must carry a measure of strength in support of the defendant's position. . . . Thus newly discovered evidence that is cumulative of evidence admitted at the trial tends to carry less weight than new evidence that is different in kind. Moreover, the judge must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial. . . . The motion judge decides not whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury's deliberations. . . . This process of judicial analysis requires a thorough knowledge of the trial proceedings . . . and can, of course, be aided by a trial judge's observation of events at trial . . . .

> "Not only must the allegedly new evidence demonstrate the materiality, weight, and significance that we have described, but it must also *have been unknown to the defendant or his counsel and not reasonably discoverable by them at the time of trial (or at the time of the presentation of an earlier motion for a new trial). . . .* The

defendant has the burden of proving that reasonable pretrial diligence would not have uncovered the evidence." (Citations omitted and emphasis added.)

A defendant also bears the burden of demonstrating that any newly discovered evidence is admissible. See *Commonwealth* v. *Lopez*, 433 Mass. 406, 416 (2001); *Commonwealth* v. *Doherty*, 394 Mass. 341, 346-347 (1985).

In reviewing the denial or grant of a new trial motion, we "examine the motion judge's conclusion only to determine whether there has been a significant error of law or other abuse of discretion." *Commonwealth* v. *Grace, supra* at 307. If the motion judge did not preside at the trial, we defer only to the judge's credibility determinations and "regard ourselves in as good a position as the motion judge to assess the trial record." *Id.*

3. The parties dispute whether the defendant waived his present claim by not asserting it in his first motion for a new trial in 1991 and, if a waiver occurred (the Commonwealth is probably correct that there was a waiver), what the consequences might be. We need not definitively resolve the disagreement because, as we shall next point out, the information that was determined by the judge to be newly discovered evidence is not within the purview of that doctrine. Thus, the defendant, not having shown that he possesses newly discovered evidence, is not entitled to a new trial because he has not demonstrated the chance that a miscarriage of justice occurred.

4. The judge erroneously concluded that the defendant had satisfied his burden of establishing that the evidence supporting his new trial motion was newly discovered and, particularly, that the evidence was not reasonably discoverable by the defendant or his counsel at the time of trial or his first motion for a new trial. We first take up Barrett's confession letter to the defendant's mother, and then consider Barrett's verbal confession to Robb.

(a) *Barrett confession letter.* The judge erroneously concluded that the defendant could not have reasonably discovered, prior to his 1991 motion for a new trial, the exculpatory content of Barrett's confession letter because he feared, and had been threatened by, Bulger and had been intimidated by Bulger and

Flemmi. In essence, the judge, relying on *Commonwealth* v. *Pike, supra,* carved out a coercion or fear exception to the reasonable diligence requirement of newly discovered evidence. This was inappropriate.

Although affirming the judge's denial of the defendant's motion for a new trial based on battered woman syndrome, the court in the *Pike* decision stated that "in appropriate cases, evidence of battered woman syndrome may constitute 'newly discovered' evidence, even though the condition may have existed prior to, or at the time of, trial." *Id.* at 222. The court explained: "We do so because our case law, as well as experts in the field, acknowledge that a common characteristic of battered women is a 'learned helplessness,' which manifests itself in an inability of the woman to perceive herself as abused, or to gain help by communicating the abuse to others." *Id.* Put another way, "the failure to recognize (or be able to communicate to one's attorney or others) that she is a battered woman is itself a specific characteristic of the syndrome." *Id.*

Unlike the defendant in *Commonwealth* v. *Pike, supra,* the defendant did not suffer from any recognized psychological syndrome, or other mental impairment, that prevented him from pursuing potentially exculpatory evidence. The *Pike* decision is inapposite to this case. Despite knowing at the time of trial that Barrett was considered a suspect; despite, before his trial, having been given repeated warnings by Bulger not to say anything about Barrett; despite learning in March, 1982, from his mother that she had received a letter from Barrett that claimed the defendant was innocent; and despite having heard "word in the street" that Barrett had killed the victim, the defendant "decide[d] not to uncover the content contained in Barrett's letter."[13] The basis for the defendant's decision, a coercion or fear exception to the standards governing newly discovered evidence, has no support in the law. It is surely regrettable that parties or witnesses in criminal prosecutions may be subject to

---

[13]The defendant's trial counsel, aware of the Commonwealth's view that the defendant and Barrett had acted as joint venturers, did not investigate Barrett's involvement, as evidence linking Barrett to the crime would not likely be exculpatory of the defendant and instead would potentially support the Commonwealth's theory.

threats and intimidation to the point where they may not come forward or cooperate. However, recognizing a new exception of the sort argued for by the defendant — an exception of almost limitless definition and application that insulates those who acquiesce to pressure — impermissibly evades the issue of witness intimidation and threatens the integrity of the trial process. Consistent with his duty of reasonable diligence, the defendant could have "uncovered" the content of Barrett's confession letter and revealed the content to his attorney, and he could have sought protection for himself and his family from the government. "A hard choice is not the same as no choice." *United States* v. *Martinez-Salazar*, 528 U.S. 304, 315 (2000). He should not be rewarded for making the wrong choice with resulting impairment of the integrity of the jury's verdict.

In reaching his conclusions, the judge made findings concerning the "backdrop" of South Boston and the past activities, past reputations, and current status of both Bulger and Flemmi. The judge ruled on information that, decades after the defendant's trial, had become common knowledge. The critical issue, however, was what the defendant knew, or reasonably should have discovered, before or shortly after his trial in 1981, and by the time of his first motion for a new trial in 1991. Subsequent disclosures about the evils and wrongdoings of Bulger and Flemmi are not legally relevant. We are satisfied that the defendant had it within his means to ascertain the content of the Barrett letter long before he filed his current motion, and his deliberate failure to do so renders the information clearly not newly discovered.

(b) *Barrett's verbal statements to Robb.* In 1981, during his trial, the defendant realized, or should have realized, that the Commonwealth considered Barrett a suspect. When the defendant asked Robb if Barrett could stay with her in California, he informed her that Barrett "was in trouble." While Barrett was living with Robb in the 1980's, some time after the defendant had been convicted and while he was serving his sentence (but before the defendant's first motion for a new trial in 1991), Robb asked the defendant why a friend would not come forward. Despite the fear that prompted the defendant to make it his "policy" never to discuss Barrett with anyone, even

his mother, he never "halted the conversation when Barrett was the topic of conversation" with Robb. In light of these circumstances, and the fact that the defendant and Robb maintained communications (albeit not on a regular or frequent basis) after she accepted Barrett into her California home, the defendant (assuming he did not already know that Barrett was "in trouble" because Barrett had had a role in the victim's murder) had to make no more effort than to ask Robb (before filing his first motion for a new trial in 1991) if Barrett, whom he knew to be a suspect, had said anything about the murder. As such, the judge's conclusion that "there is no evidence that [the defendant] had any reason to believe that Robb possessed exculpatory evidence" is not supported by his findings and the underlying record, and consequently, is erroneous.

The defendant's contention that the testimony of Barrett's mother, given at the evidentiary hearing (that, in California, Barrett had met a woman friend, a friend of the defendant, named Sherry), for the first time triggered the discovery of Barrett's verbal confession to Robb, ignores the facts that (1) in her testimony, Barrett's mother never stated or even intimated that Barrett had confessed anything to Robb, and (2) *the defendant* had long known Robb, had arranged to have Barrett stay with Robb in California after the murder because Barrett was "in trouble," and had had communications with Robb while he was incarcerated. The defendant overlooks that the obligation to uncover evidence through reasonable diligence before trial (or before a motion for a new trial) lies not only with the defendant's counsel, but also with the defendant himself, when there is a reason to do so. See *Commonwealth* v. *Grace, supra* at 306. Barrett's incriminatory statements to Robb also are not newly discovered.

5. The judge also erred in concluding that the evidence was admissible. As previously pointed out, the judge recognized that the evidence constituted hearsay, but concluded that it was admissible because it constituted statements against penal interest. Under this exception to the hearsay rule, a statement is admissible if it satisfies three criteria: "[1] the declarant's testimony must be unavailable; [2] the statement must so far tend to subject the declarant to criminal liability 'that a reasonable man in his position would not have made the statement un-

less he believed it to be true'; and [3] the statement, if offered
to exculpate the accused, must be corroborated by circumstances
clearly indicating its trustworthiness." *Commonwealth* v. *Drew*,
397 Mass. 65, 73 (1986), quoting *United States* v. *Thomas*, 571
F.2d 285, 288 (5th Cir. 1978). See *Commonwealth* v. *Carr*, 373
Mass. 617, 623-624 (1977).

We agree with the judge that the first two criteria of the
exception were satisfied. Barrett's invocation at the evidentiary
hearing of his right under the Fifth Amendment not to
incriminate himself rendered his testimony unavailable. *Com-
monwealth* v. *Drew, supra.* Barrett's admission to the defen-
dant's mother that he had killed the victim, and his admission
to Robb that he had killed someone whom the defendant had
been convicted of killing, were essentially direct admissions of
guilt to persons loyal to the defendant that would have subjected
Barrett to criminal liability, and it could be found that "any
reasonable person in his position would have known as much,
and for that reason would not have made the statement without
believing it to be true." *Commonwealth* v. *Tague*, 434 Mass.
510, 516 (2001), cert. denied, 534 U.S. 1146 (2002).

The judge erred on the third criteria because Barrett's state-
ments were not adequately corroborated. Under this test, a judge
should "assess the credibility of the declarant [Barrett] and . . .
admit a statement if 'there is some reasonable likelihood that
the statement could be true.' " *Commonwealth* v. *Galloway*, 404
Mass. 204, 208 (1989), quoting *Commonwealth* v. *Drew, supra*
at 76. "[T]he judge may consider . . . the timing of the declara-
tion and the relationship between the declarant and the witness
. . . the reliability and character of the declarant . . . whether
the statement was made spontaneously . . . whether other
people heard the out-of-court statement . . . whether there is
any apparent motive for the declarant to misrepresent the matter
. . . and whether and in what circumstances the statement was
repeated" (citations omitted). *Commonwealth* v. *Drew, supra.*
The judge should not, however, assess a proffered witness's
credibility and should leave that task to the jury. *Id.* Finally, a
judge "should not be stringent." *Id.* at 75 n.10. "If the issue of
sufficiency of the defendant's corroboration is close, the judge
should favor admitting the statement." *Id.* As may be expected

in light of the numerous factors to be considered, the cases are fact sensitive.

Stating that "the evidence and the circumstances of this case could . . . indicate the unreliability of Barrett's confessions," the judge apparently thought the issue of corroboration was a close one, and therefore deemed the statements admissible. The bases articulated by the judge to demonstrate the trustworthiness of Barrett's statements, however, were flawed and thus rendered his ultimate conclusion erroneous.

The judge found that the timing of Barrett's statements, "shortly after [the defendant's] conviction," reflected trustworthiness because Barrett had not attempted to curry favor with the authorities and because he had confessed "amidst a homicide case that was still relatively fresh." While trustworthiness is present when a declarant's statement is *contemporaneous* with a defendant's arrest or incarceration (or a declarant's arrest or incarceration), see *Commonwealth* v. *Drew, supra* at 77, the record does not support the judge's characterization of the timing. Barrett's letter was not contemporaneous with the defendant's arrest or conviction but, rather, was written some *nineteen months after* his arrest and some *seven months after* his conviction. While no definitive time was provided concerning Barrett's statements to Robb, his statements were made while he lived with Robb initially in Sausalito and later, in the spring of 1982, in Mill Valley, and were made before she moved to southern California in the mid-1980's. Thus, Barrett's statements to Robb were not contemporaneous with either the defendant's arrest or his conviction. The timing of the statements did not properly warrant a determination that they were trustworthy.

The judge also found trustworthiness in Barrett's statements because Barrett had reason to believe he was a suspect in the victim's murder. This consideration is more relevant to the second criteria of the exception. The judge overlooked the evidence that Barrett likely also knew, based on the fact that no charges were ever brought against him, that there was no evidence linking him to the victim's murder. Unlike the defendant, Barrett did not match the description of the man the witnesses in Faxon Park saw running after the shooting. Cf.

*Commonwealth* v. *Tague, supra* at 517. Three of the witnesses described the man as having dark or brown hair. Barrett had blond or "sandy" hair, and did not look at all like the defendant.

Most problematic is the judge's finding of corroboration based on the fact that Barrett's separate confessions corroborated "each other."[14] While Barrett told two people (the defendant's mother and Robb) essentially the same thing, his statements contained no details about the crime and no factual details as to his involvement in it. See *id.*; *Commonwealth* v. *DiToro*, 51 Mass. App. Ct. 191, 199 (2001). Barrett did not supply the victim's name to Robb, and with respect to both women (Robb and the defendant's mother), he never stated how he committed the murder (by way of a shooting). Further, Barrett's close relationship with the defendant, by itself, may demonstrate "an obvious motive to fabricate his statement." *Id.*

We also add that Barrett's character was, at best, questionable. At the evidentiary hearing, the defendant acknowledged that Barrett drank alcohol and used marijuana. Robb had observed Barrett drinking and suspected that he used drugs because of his "destructive" and "erratic" behavior. Barrett also had been arrested (in the 1970's) for armed robbery and for assault and battery by means of a dangerous weapon. The judge should have factored this evidence into his assessment. See *Commonwealth* v. *Marple*, 26 Mass. App. Ct. 150, 159 (1988). Had he done so, he would have had no choice (on this record) but to question the reliability and trustworthiness of any statements made by Barrett. We can sum up the weakness in the corroboration of the defendant's proposed proofs by looking to the words of Justice Kaplan in *Commonwealth* v. *Marple, supra*:

> "[A] rundown of factors mentioned in *Commonwealth* v. *Drew, [supra* at 76], and other authority shows a distinct deficit. The character and reliability of the declarant were suspect. The alleged statements were not contemporaneous with the homicide or the defendant's indictment; they came more than a year after the incident and were reported to the defendant . . . years later. [Here, it is simply

---

[14]The judge properly did not rely on the defendant's testimony to corroborate the hearsay statements attributed to Barrett. See *Commonwealth* v. *Drew*, 397 Mass. 65, 77 n.12 (1986).

unknown if] [t]he statements were not spontaneous but were elicited by questions. They were confided to friendly or sympathetic associates, not to any indifferent audience, and, although there was repetition, the two hearers [or readers] can be seen as belonging to the same coterie. The statements themselves provided no detail toward exculpating the defendant, and the evidence in the case apart from the proposed hearsay [here, the identification of the defendant at trial] indicated strongly that the blanket exonerating assertions were false . . . ." (Footnotes and citations omitted.)

Based on the considerations discussed, Barrett's alleged confessions lack trustworthiness and are not otherwise sufficiently corroborated. The evidence would not be admissible. See *Commonwealth* v. *Drew, supra* at 78; *Commonwealth* v. *Marple, supra.*

6. The order allowing the defendant's motion for new trial is vacated. A new order shall enter denying the motion.

*So ordered.*