NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11501


COMMONWEALTH  vs.  EDWARD G. WRIGHT.



Hampden.     April 10, 2014. - August 20, 2014.

Present:  Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly,
& Lenk, JJ.[1]


Homicide.  Practice, Criminal, New trial, Hearsay, Capital case.
    Evidence, Third-party culprit, Exculpatory, Opinion,
    Hearsay, Motive, Relevancy and materiality.



    Indictment found and returned in the Superior Court
Department on June 7, 1984.

    Following review by this court, 411 Mass. 678 (1992), a
motion for a new trial, filed on April 24, 2012, was considered
by C. Jeffrey Kinder, J., and motions for reconsideration were
considered by him.

    A request for leave to appeal was allowed by Botsford, J.,
in the Supreme Judicial Court for the county of Suffolk.


    Richard J. Fallon (Matthew A. Kamholtz with him) for the
defendant.
    Dianne M. Dillon, Assistant District Attorney, for the
Commonwealth.

------

    [1] Chief Justice Ireland participated in the deliberation on
this case prior to his retirement.

GANTS, J.  On April 10, 1985, the defendant, Edward G. Wright, was convicted by a jury of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty.  We affirmed the defendant's conviction and the denials of his first and second motions for a new trial.  Commonwealth v. Wright, 411 Mass. 678, 683, 686-689, 691 (1992).  After various proceedings, which we will detail below, the defendant, in April, 2012, filed his fifth motion for a new trial, arguing, insofar as relevant here, that newly discovered evidence in the form of third-party culprit evidence warranted a new trial.  The motion was denied without an evidentiary hearing, as were motions for reconsideration.  The defendant then petitioned a single justice of this court, pursuant to the "gatekeeper" provision of G. L. c. 278, § 33E, for leave to appeal the denial of his fifth motion for a new trial.  The single justice allowed the appeal to proceed.  We now affirm the denial of the motion.

1.  Trial.  We set forth the relevant facts as detailed in our earlier opinion, which we supplement in footnotes:

> "In the afternoon of May 14, 1984, officers of the Springfield police department found the victim's body with more than sixty stab wounds in her second-floor apartment at 306 Dwight Street Extension.[2,3]  There was evidence that

---

[2] The medical examiner opined that the victim died as a result of blood loss due to multiple knife wounds.  She found evidence of defensive wounds on one of the victim's hands, which had been bound together.  Testing conducted on a vaginal swab of the victim revealed the presence of seminal fluid and sperm

she had died between 12:15 A.M. and 6:15 A.M. that day.  A neighbor heard a woman screaming for about fifteen minutes shortly before 4 A.M.[4]  He then heard a motor vehicle start up and leave the area.

"There was evidence from which the jury could have found the following.  About 12:45 A.M. on May 14, the defendant and the victim left a motor vehicle that the defendant had borrowed from a friend [Vernal Tyrone Archie] and entered the victim's apartment.  At daybreak, the defendant returned to [Archie's] apartment.[5]  [Archie] thereupon drove the defendant to Delaware, leaving about 8 A.M.  Shortly after the victim's body was discovered, the defendant called one Arthur Turner.[6]  Turner lived with his mother, who previously had been the woman friend of the defendant.[7]  The defendant told Turner that he had killed someone and gave the victim's address.  He described the

---

cells.  There was no scientific testing done to include or to exclude the defendant as the source of this seminal fluid and sperm cells.

[3] There was no sign of forced entry into the victim's apartment.

[4] The woman repeated, "Please don't do it," and screamed for somebody to call the police.

[5] Vernal Tyrone Archie observed that the defendant had changed his pants, but wore the same shirt as he had had on when Archie last saw him.

[6] Telephone records admitted in evidence showed that, at 4:41 P.M., on May 14, a telephone call of thirty-six minutes in duration was made from the defendant's sister's home in Delaware to a telephone number that Arthur Turner identified as his own.

[7] At the time of the killing, there was an outstanding abuse prevention order against the defendant for which Turner's mother had applied.  Turner and the defendant did not get along.  A few days before the victim's murder, Turner had offered the defendant money to return to Delaware [without Turner's mother] and had agreed to transport him there.  The defendant declined the offer because he was waiting for a check that he expected to receive on the Saturday before the murder.

victim as a 'white bitch [on tic]'[8] and said he had
stabbed her with a knife that had a fourteen-inch blade
because she had fired a gun at him.  On the next day,
Turner read about the victim's murder, and on May 16, he
gave a statement to the police [that recounted the
defendant's telephone call to him on May 14].[9]

"Evidence of blood in the victim's apartment and in
the borrowed motor vehicle tended to prove the defendant's
guilt.  A bloody imprint made by a shoe on the tiled
kitchen floor of the victim's apartment could have been
made by a sneaker that the defendant was wearing when he
was interviewed by Springfield police after Wilmington,
Delaware, police had arrested him on May 16 at his sister's
home.[10]  There were traces of occult blood [blood not
visible to the eye, but detectable by chemicals], possibly
of fairly recent origin, on the steering wheel, headlight

---

[8] As explained at trial by a police officer, a person on
"tic" is on drugs.

[9] In December, 1984, Turner, accompanied by his mother, went
to the office of the defendant's trial counsel and signed a
statement in which he said he could not say whether the person
who had called him from Delaware on May 14 had been the
defendant.  At trial, Turner testified that the caller stated
that he was the defendant, but Turner could not be sure.  Turner
did not, however, recant the content of the telephone
conversation, and he conceded at trial that he had told the
police and had testified to the grand jury in June, 1984, that
the caller was the defendant.  During his redirect examination,
Turner testified that, before he had executed the written
statement at the defendant's trial counsel's office (stating
that he could not be sure that the caller had been the
defendant), his mother had "made up" with the defendant.

[10] Approximately one hour after his arrest and after having
been given the Miranda warnings, the defendant told Delaware
police officers that he had picked up the victim at
approximately 10 P.M. on May 13 at a bar.  The defendant said
that they retrieved the victim's baby from her mother's house
and went back to her apartment where they drank and had sex.
The defendant said he left around 1 A.M., now May 14, when the
victim was sleeping.  He characterized the victim as "a whore,"
who was "on tic."  During his testimony at trial, the defendant
denied making any statements to the Delaware officers.

switch, inside door handle, and other parts of the motor
vehicle [including the direction signal and accelerator
pedal] that the defendant had borrowed on the night of the
murder.

"The defendant testified that he had met the victim
[whom he had known] at a nightclub and had later driven her
to her apartment, [arriving at about midnight] with several
intermittent stops.[11]  They talked for about an hour, and,
when he left [sometime between 1 and 1:30 A.M.], she let
him out of her apartment.  The defendant denied calling
Arthur Turner from Delaware on May 14."

Wright, 411 Mass. at 679-680.

We describe some additional evidence that was not set forth
in Wright, supra, but is relevant to this appeal.  During his
testimony at trial, the defendant offered a possible explanation
for the presence of blood in Archie's automobile.  He testified
that, on May 7, 1984, he had been "brutally" attacked and
stabbed.  Archie drove the defendant to the hospital in Archie's
automobile, arriving at about midnight.  During the ride there,
the defendant had been "bleeding pretty bad."  The hospital
record was entered in evidence, as were photographs of the
defendant's injuries.

Significant to this appeal is the testimony of the
defendant concerning the events that transpired before he and
the victim went to her apartment.  The defendant testified that,
at about 10 P.M. on May 13, he went to the nightclub where the

---

[11] The defendant testified that he and the victim had
engaged in sexual intercourse in the back seat of Archie's
automobile before they went to her apartment.

victim worked and met her there. Before they left, the victim had a conversation with Andrew Jefferson, whom the defendant knew.[12] After that, the defendant and the victim went to Archie's automobile, and the defendant turned the vehicle around in a nearby parking lot. In the parking lot, the vehicle stopped and the victim got out and went back to the nightclub. Allen G. Smalls,[13] who had been outside, went inside the nightclub when the victim was crossing the street.

The defendant left to get gasoline and then returned, entering the nightclub. The defendant testified that, as he and the victim were leaving, Smalls grabbed the victim and caused her to drop her purse, the contents of which spilled onto the floor. The defendant recounted that Smalls reached down and picked up one of the items that had come from the victim's purse and placed it in his pocket. Smalls and the victim exchanged words in a "loud tone of voice," and Smalls followed the victim and the defendant to the nightclub's exit and watched as the victim entered the automobile with the defendant.

-----

[12] In postconviction proceedings, it was alleged that, at the time of the victim's murder, Andrew Jefferson was a boy friend of the victim.

[13] The relationship between Allen G. Smalls and the victim was not developed at trial. In postconviction proceedings, there was evidence that Smalls had been a previous boy friend of the victim.

The defense called several witnesses in addition to the defendant. The first witness was a man who lived in the victim's apartment building. He testified that, on May 14, at around 9:30 or 10 A.M., he heard banging and observed a man, whom he had seen with the victim previously, knocking on the victim's door.[14] The man was Jefferson.

The defendant's sister and her boy friend also testified. The defendant's sister testified that, on May 14, from her home in Delaware, she had telephoned Turner and had made two other calls that appeared on a printout of the telephone records for her telephone number. Her boy friend testified that she was the only one using the telephone that day.

In rebuttal, the Commonwealth called the sister of Turner's mother, who testified that, on May 14, she had received a telephone call from the defendant (not his sister) asking for the telephone numbers of Turner and Turner's sister. The defendant informed her that he had arrived in Delaware without a problem.[15]

---

[14] This witness had arrived home sometime after ending his work shift at 7:30 A.M.

[15] According to the telephone records admitted in evidence, this call originated from the defendant's sister's telephone at 4:16 P.M., on May 14, and lasted four minutes. This call preceded the one made to Turner. In his testimony at trial, the defendant denied making any telephone calls from his sister's house.

In re-rebuttal, the defense called Turner's mother, who testified that her sister had stated to her that she had not spoken with the defendant on May 14. During cross-examination, Turner's mother stated that the defendant currently was her boy friend and that she had been visiting him regularly during the time that he was detained.

2. New trial motions and other procedural history. Before we heard the defendant's appeal from his conviction, he filed his first and second motions for a new trial. His first new trial motion was based, as relevant here, on newly discovered evidence that Smalls had made a statement in late April, 1985, admitting to having killed the victim. The evidence took the form of an affidavit from Smalls's mother, Lee Britt, dated January 13, 1986, in which she averred, insofar as relevant here, to the following. In April, 1985, after the defendant's trial had ended, she had visited Smalls and his then girl friend, Maria Rivera, in Florida. There, Rivera told her that, in 1984 after the victim had been killed, Smalls had threatened to kill Rivera, stating, "I will kill you just like I did [the victim]." Rivera added that she thought that Smalls was "only trying to scare her." On May 12, 1985, Britt asked Smalls on the telephone whether he had killed the victim and he denied doing so, adding that everyone else had forgotten about the murder after the defendant's conviction as should she, and that

the victim was better off dead because her life had been "a Hell" and she had been miserable. In another telephone conversation Smalls had admitted to Britt to having told Rivera that he had killed the victim, but stated that he only said these words out of anger "to scare her." Further, Britt's husband told her that Smalls knocked on the back door and woke him up at 3:30 $\underline{A}$.$\underline{M}$. on May 14. Britt averred that Smalls had not told her the truth about the time of his arrival home, because he had said that he "came straight home that morning" after getting a "ticket" on the "early morning" of May 14 for "going down a one way street on his moped." She also attested that, "[a] few days after the murder," Smalls came home with some record albums and a small gold purse that he said belonged to the victim and that he had taken from the victim's apartment by "breaking through a window" to gain entry. She added that her daughter, Cynthia Harris, told her on May 14 that Smalls was trying to sell a large hunting knife.[16]

At an evidentiary hearing on the motion, Britt testified to the content of her affidavit. She also testified that, at the time of the defendant's trial, Smalls was residing in Florida. He had moved there about seven or eight months after the murder.

---

[16] Lee Britt caused another daughter to purchase the knife from Smalls and later gave the knife to the defendant's then attorney. Subsequent forensic testing revealed the presence of blood on the knife, but otherwise was inconclusive.

At the time of her testimony at the evidentiary hearing, on October 7, 1986, Smalls was living with Britt. He had returned from Florida "just a few months ago." Britt testified that Rivera was then living in Springfield and she last had seen her about two months before.

Harris testified at the hearing that Smalls had tried to sell a hunting knife to her boy friend. Harris said she thought that the attempted sale occurred on May 14, but she was "not positive on the date."

The defendant's first and second motions for a new trial were denied by the trial judge. The judge noted, concerning the purported newly discovered evidence, that Britt and her daughter had been available at the time of the defendant's trial, but neither had testified. The judge also stated that "virtually all of the testimony was hearsay." The judge added that he "particularly [found] the testimony of [Britt] without credibility and not worthy of careful consideration." He further concluded that the testimony of Britt's daughter was "inconsequential and of dubious probative value."

The defendant's appeals from the denials of his first two motions for a new trial were consolidated with his direct appeal, resulting in an affirmance of his conviction and the denials of both motions. Wright, 411 Mass. at 679. We explained that the trial judge did not abuse his discretion in

concluding that the asserted newly discovered evidence "lacked probative value" based on his assessment of the credibility of the witnesses.  Id. at 683.

In September, 1992, the defendant filed a petition for a writ of habeas corpus in the United States District Court for the District of Massachusetts, attempting to raise Federal constitutional claims that had not been raised in any of the prior State court proceedings.  In 1993, the defendant voluntarily moved to dismiss the petition in order to pursue unexhausted State remedies, and his motion was allowed.  The defendant filed a third motion for a new trial in the Superior Court that was denied (by a judge who was not the trial judge) without a hearing in 1996.  Leave to appeal that denial under the gatekeeper provision of G. L. c. 278, § 33E, was denied by a single justice of this court, who concluded that all of the claims asserted had been addressed or could have been addressed during trial or on direct review, or in an earlier motion for a new trial.[17]

---

[17] "A defendant convicted of murder in the first degree who has been denied appellate relief under G. L. c. 278, § 33E, must seek leave for all subsequent appeals from a single justice of this court."  Commonwealth v. Randolph, 438 Mass. 290, 293 n.7 (2002), citing Lykus v. Commonwealth, 432 Mass. 160, 162 (2000), S.C., 451 Mass. 310 (2008).  "The single justice 'gatekeeper' has the discretion to deny applications for leave to appeal that do not raise a 'new and substantial question.'"  Randolph, supra, quoting Lykus, supra.  See G. L. c. 278, § 33E.  "An issue is not 'new' under the statute if it could have been

In 1998, the defendant returned to the Federal District Court with a second petition for a writ of habeas corpus, attempting to demonstrate a claim of "actual innocence" under Federal law to avoid the effect of a procedural default.[18] The

---

addressed at trial or during a previous appeal [or in the first motion for postconviction relief]." Randolph, supra, citing Commonwealth v. Ambers, 397 Mass. 705, 707-708 (1986). An issue is "substantial" where it raises "a meritorious issue in the sense of being worthy of consideration by an appellate court." Commonwealth v. Gunter, 459 Mass. 480, 487, cert. denied, 132 S. Ct. 218 (2011). "[T]he decision of a single justice, acting as a gatekeeper pursuant to G. L. c. 278, § 33E, is final and unreviewable." Id. at 485.

[18] "As a general rule, claims forfeited under [S]tate law may support [F]ederal habeas relief only if the prisoner demonstrates cause for the default and prejudice from the asserted error." House v. Bell, 547 U.S. 518, 536 (2006). However, there "is a narrow exception to the cause-and-prejudice imperative, seldom to be used, and explicitly tied to a showing of actual innocence." Burks v. DuBois, 55 F.3d 712, 717 (1st Cir. 1995). To establish actual innocence, a "petitioner must show that it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt." Schlup v. Delo, 513 U.S. 298, 327 (1995). That is, "[a] petitioner's burden at the gateway stage is to demonstrate . . . in light of the new evidence . . . that more likely than not any reasonable juror would have reasonable doubt." House, supra at 538. In evaluating a claim of actual innocence, "the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" Id., quoting Schlup, supra at 327-328. The standard "does not require absolute certainty about the petitioner's guilt or innocence." House, supra.

It also should be noted that the United States Supreme Court has not recognized a claim of actual innocence as a ground for Federal habeas relief. See Herrera v. Collins, 506 U.S. 390, 404-405 (1993). Rather, a colorable claim of actual innocence results in consideration only of a petitioner's procedurally defaulted claims. See Barreto-Barreto v. United

evidence included Britt's testimony during the evidentiary
hearing on the first motion for a new trial, as well as the
signed but unsworn statement Smalls made to the police at 6:55
P.M. on May 14, 1984, and his grand jury testimony.  In that
statement, Smalls said that he had known the victim for six
years, had once been her boy friend, and had "broke up with her"
in June of 1982 because "she was heavy into drugs."  Smalls said
that he saw her numerous times at the nightclub on the evening
of May 13.  At approximately 10 P.M., he saw her talking to an
older white man when "a black guy walked up to her and whispered
something in her ear,"[19] and she then left the club.  At
approximately 11 P.M., that same "black guy" came back to the
club, and the victim grabbed her coat and pocketbook, and they
went outside.  Smalls followed them, and asked her where she was
going.  She said, "I'm going to pick up my baby.  And then I'm
going home to fuck him."  Smalls recounted that he replied,
"Don't go home because I'll be there when you get there."  She
answered, "You ain't my man no more," and the victim and the
black man drove off together.  Smalls stated that this was the
last time that he saw the victim.  A short time later, Smalls
left the nightclub and received a motor vehicle citation while

_____

States, 551 F.3d 95, 102 (1st Cir. 2008), quoting Schlup, supra
at 315.

    [19] Smalls, on May 15, after viewing a photographic array,
identified this man as the defendant.

driving his moped home. He said that everyone was sleeping when he got home. In his testimony to the grand jury on June 4, 1984, Smalls affirmed his statement to police.

On September 24, 1999, a Federal District Court judge denied the petition, rejecting the defendant's claim of actual innocence, but noting that, assuming the defendant's claims would be "properly corroborated," the information "would provide troubling new evidence of actual innocence." The Federal District Court judge specifically noted that the defendant had failed to present an affidavit from Rivera regarding Smalls's alleged admission (as opposed to Britt's hearsay statement of what Rivera had told her), and had failed to pursue any forensic testing of the knife that Smalls had sold to his sister.

The defendant contacted Britt, who reported that Rivera was now married, had assumed a new surname,[20] and was living with her husband in Florida. A private investigator hired by the defendant's family found Rivera within two weeks and obtained a tape-recorded statement from her on October 12, 1999, in which she confirmed that Smalls had hit her in 1985 and threatened to kill her "the same way [he] did [the victim]." Thereafter, Rivera repeated the substance of her statement in an affidavit dated January 28, 2000, where she attested that "in late April,

---

[20] For ease of reference, we shall continue to refer to this witness as Maria Rivera.

1985" Smalls "for no reason" slapped her, began beating her, and told her, "Bitch, I am going to kill you the same way I killed the [victim]."[21]

The defendant sought reconsideration on his habeas corpus petition based on that affidavit.  The Federal District Court judge, however, recommended that the defendant first pursue another motion for a new trial in State court and recommended that the defendant conduct forensic testing on the knife.  She stayed the Federal court proceedings with the understanding that the defendant would return to State court with a fourth motion for a new trial.

The defendant obtained forensic testing of the knife, which, as noted earlier, revealed the presence of blood on the knife, but otherwise was inconclusive.  In January, 2003, the defendant filed his fourth motion for a new trial.  In support of his claim that Smalls had implicated himself in the victim's murder, the defendant relied on alleged newly discovered evidence in the form of Rivera's affidavit, as well as her statements to a private investigator.  The defendant also argued that his prior appellate counsel had been ineffective in not locating Rivera in 1986 when his first new trial motion had been

_____

[21] Rivera's memory of the date of this incident is in conflict with Britt's account; Britt claimed that Rivera told her that Smalls made this statement to her in 1984 after the victim's murder.

filed.  A Superior Court judge denied the defendant's fourth

motion for a new trial, as well as a motion to reconsider.

Pursuant to the gatekeeper provision of G. L. c. 278, § 33E, the

defendant petitioned for leave to appeal the denial of his

fourth motion for a new trial, and the petition was denied by a

single justice of this court in June, 2006.  The single justice

concluded that the evidence of Smalls's admission was not newly

discovered and not "new" for the purposes of the petition.[22]  See

note 17, supra.  The single justice also determined that the

question, even if "new," was not "substantial," because Rivera's

---

[22] The single justice correctly observed that, at the time
of his first motion for a new trial, the defendant knew about
and raised the issue whether Smalls's statement to Rivera
justified granting him a new trial.  The only change, with
regard to the filing of his fourth motion for a new trial, was
that he had obtained that evidence directly from Rivera in her
affidavit and in statements to the private investigator.  The
single justice concluded that the defendant had failed to meet
his burden of showing that this evidence was not reasonably
discoverable in 1986 (or at the time of filing earlier motions
for a new trial).  The single justice went on to reject the
defendant's claim that, if Rivera could have been discovered
with reasonable diligence, then defense counsel's performance
must have been constitutionally deficient, noting that the
defendant "has not indicated what his counsel did or failed to
do to try and locate Rivera, what information he had or was
available to him, or that Rivera could have been discovered with
reasonable diligence."  Also, the single justice found that the
defendant's claim that he could not locate Rivera in 1986
because Britt was refusing to cooperate due to her ostensible
fear of Smalls was not supported by the record, which
demonstrated her cooperation with the defense in many ways at
that time.

account of Smalls's admission was hearsay that was not, in her view, admissible as a statement against his penal interest.[23]

The defendant proceeded back to Federal court, requesting an evidentiary hearing to consider Rivera's testimony. A Federal District Court judge allowed the request and held an evidentiary hearing on October 26, 2007, at which Rivera testified. At the hearing, Rivera provided the following testimony.[24]

Rivera began to date Smalls in 1981 or 1982. She described him as tall and muscular, and as having an "evil streak."

---

[23] "An out-of-court statement made by a person that he, and not the defendant on trial, committed the crime is admissible where: (1) the declarant's testimony is unavailable; (2) the statement tends so far to subject the declarant to criminal liability that a reasonable man would not have made the statement unless he believed it were true; and (3) the statement, if offered to exculpate the accused, is corroborated by circumstances clearly indicating its truthfulness." Commonwealth v. Gagnon, 408 Mass. 185, 193-194 (1990), S.C., 430 Mass. 348 (1999). Noting that Smalls had cooperated with police and had testified before the grand jury, the single justice concluded that there was "no basis . . . for concluding that he would now refuse to testify," and thus concluded that the first part of the test had not been satisfied. Although recognizing it to be a closer question, the single justice concluded that the second part of the test also was not met. Her determination was based, in part, on Rivera's statement that, at the time of Smalls's admission, he had been "drinking heavily"; that Rivera told Britt that Smalls had made the statement "only trying to scare her"; and that the statement was made in Florida after the defendant's conviction at a time when Smalls likely knew of that conviction.

[24] It should be noted that, at this proceeding, no one from the Hampden County district attorney's office was present to cross-examine Rivera. Rather, the cross-examination was conducted by an assistant attorney general.

Smalls previously had dated the victim and had posted nude pictures of her in his bedroom at his mother's house while dating Rivera. Smalls referred to the victim as his "first love," and told Rivera that the victim had been the first one to "introduce [Smalls] to sex" when he was fourteen years of age. In Rivera's opinion, Smalls became "hooked" on the victim and she had heard him say, "[The victim's] mine and only mine." Smalls used cocaine and drank heavily on a daily basis. He also regularly hit Rivera. Rivera, who had never met the victim, stopped dating Smalls about six months before the murder. At the time of the victim's murder, Rivera was living with her mother in Springfield.

Rivera went back to dating Smalls again after the victim's murder and was dating him at the time of the defendant's trial. Sometime after the defendant's conviction, Smalls took Rivera to a wooded area in the Springfield area and ordered her to get out of the automobile. He had been drinking and had used cocaine. He threw her over the trunk of the automobile, grabbed her, and "forced himself" on her, ordering her to "stay still" or else he would kill her "just like [he had] killed [the victim]." When asked by Rivera, "So you're the one [who] killed [the victim]?" Smalls responded, "Yeah, but nobody's going to find out." While she was living in Springfield, Rivera relayed the incident to Britt. A couple of days after making the threat, Smalls

instructed Rivera not to tell anyone what he had said. A short time later, Rivera "got away from Smalls," and moved to Florida. She never reported Smalls's abuse or threat to police because she feared him.

The Federal District Court judge found Rivera credible and concluded that the evidence was sufficient to establish a likelihood that reasonable jurors would have a reasonable doubt as to whether the defendant or Smalls was the killer, and therefore that the defendant had satisfied the "actual innocence" standard necessary to permit review of the procedurally defaulted Federal constitutional claims. The Federal District Court judge specifically noted that, under the legal standard governing the determination of "actual innocence," she considered all the evidence presented without regard to its admissibility at trial.[25]

---

[25] The Federal District Court judge did not base her decision solely on Rivera's testimony. She also relied on Smalls's statement to police on May 14, 1984; Smalls's grand jury testimony; an unsworn signed statement to police made on May 14, 1984, by a dancer at the nightclub in which she said that at approximately 11:30 $\underline{P}$.$\underline{M}$. on May 13, the victim, before she "walked fast out of the bar," had screamed at Smalls, pointed her finger at him, said something about a baby, and dropped her purse, spilling its belongings; the affidavit and testimony of Britt presented in connection with the defendant's first new trial motion; the testimony of Britt's daughter from the evidentiary hearing on the defendant's first new trial motion; Rivera's affidavit executed on January 28, 2000; and the transcript of the tape-recorded statement made by Rivera to the private investigator hired by the defendant's family.

The Federal District Court judge later considered the defendant's Federal constitutional claims and denied his habeas corpus petition.[26]  The United States Court of Appeals for the First Circuit affirmed.  Wright v. Marshall, 656 F.3d 102, 112 (2011), cert. denied, 132 S. Ct. 1565 (2012).

In April, 2012, the defendant filed his fifth motion for a new trial in Superior Court primarily based on Rivera's Federal District Court testimony, which he alleged to be newly available evidence that would be admissible as third-party culprit evidence and would warrant a new trial.  The defendant claimed that the third-party culprit evidence consisted of Smalls's "confession" to Rivera that he had killed the victim and Smalls's admission to his mother, Britt, that he had made the statement to Rivera that he would kill her just like he had

---

[26] The defendant claimed that his Federal due process rights had been violated at trial by (1) the prosecutor and trial judge subjecting Turner to intimidating instructions and repeated threats of prosecution for perjury; (2) the admission in evidence of Turner's identification of the defendant as the caller who had confessed to killing the victim; (3) the admission in evidence of Turner's grand jury testimony; and (4) the failure of the trial judge, in the absence of a specific request, to give a mistaken identification instruction regarding Turner's identification of the defendant as the caller making the confession.  In addition, the defendant argued ineffective assistance of counsel under the Sixth Amendment to the United States Constitution resulting from trial counsel's failure (1) to move to suppress Turner's identification of the defendant as the person who called him and who admitted to killing the victim; (2) to effectively argue against the admissibility of Turner's grand jury testimony; and (3) to request a mistaken identification instruction.

killed the victim.  In support of his motion, in addition to Rivera's testimony in the Federal District Court and the Federal District Court judge's decision regarding "actual innocence," the defendant's proffer included:

> (1) an affidavit executed by Rivera dated January 28, 2000, that had accompanied his fourth motion for a new trial;
>
> (2) a transcript of the tape-recorded statement made by Rivera to the private investigator hired by the defendant's family that had accompanied his fourth motion for a new trial;
>
> (3) an affidavit executed by Britt dated January 13, 1986, that had accompanied his first motion for a new trial;
>
> (4) an affidavit executed by Britt dated October 5, 1999, that had accompanied his fourth motion for a new trial;[27]
>
> (5) an affidavit executed by the defendant dated October 17, 1999, that had accompanied his fourth motion for a new trial, and that explained his efforts to locate Rivera after September, 1999; and
>
> (6) an affidavit executed by the defendant dated January 25, 2001, that had accompanied his fourth motion for a new trial, that recounted communication that he had had with Britt and the statements that she had made to him which essentially mirrored those in her own affidavits, and that stated the efforts that the defendant had undertaken through Britt to obtain an affidavit from, and to locate, Rivera.

Rivera had died on May, 23, 2008, and the defendant so notified the court.

---

[27] In this affidavit, for purposes of this appeal, Britt confirmed statements that she had made in her 1986 affidavit and stated that she had not been prepared to testify at the evidentiary hearing on the defendant's first motion for a new trial.

A different Superior Court judge (who was not the trial judge) denied the defendant's fifth motion for a new trial, concluding that the defendant had not established that justice may not have been done. The judge stated that the Federal District Court judge's finding of "actual innocence" was not a finding of factual innocence, but "was merely a procedural threshold necessary for relief from procedural default." See note 18, supra. The judge denied the defendant's motions for reconsideration.

As has been noted, the defendant appealed the denial of his fifth motion for a new trial pursuant to the gatekeeper provision of G. L. c. 278, § 33E. A single justice of this court allowed the petition, correctly noting that the "fact of Smalls's alleged admission to [Rivera] is not new." She concluded, however, "[T]he fact that [Rivera] has been located and has corroborated Britt's affidavit and testimony with a direct account of Smalls's statement is new, or at least, in my view, sufficiently new to satisfy the standard imposed by G. L. c. 278, § 33E." She further explained that "[a]s far as the substantiality of the evidence is concerned, [Rivera's] affidavit and testimony present powerful third-party culprit evidence where Smalls was indisputably present with the victim before the murder and the Commonwealth's case against the defendant was based entirely on circumstantial evidence." She

noted that Rivera's testimony in Federal court likely would be admissible under the hearsay exception for prior recorded testimony of an unavailable declarant.  See Mass. G. Evid. § 804(b)(1), at 290, 301-302 (2014).

3.  Discussion.  As an initial matter, we review only that aspect of the defendant's claim that was certified for review by the single justice, namely, his claim of newly discovered evidence.  See Commonwealth v. Randolph, 438 Mass. 290, 293 n.5 (2002).  The defendant argues that his fifth motion for a new trial was erroneously denied "because of the new, credible testimony of [Rivera] and its admissibility as 'third-party culprit' evidence, and because there is reason to be skeptical of the 'strong' circumstantial evidence" against him.

Where a defendant seeks a new trial on the basis of newly discovered evidence, he "must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction."  Commonwealth v. Weichell, 446 Mass. 785, 798 (2006), quoting Commonwealth v. Grace, 397 Mass. 303, 305 (1986).  The governing principles are as follows:

> "The evidence said to be new not only must be material and credible . . . but also must carry a measure of strength in support of the defendant's position. . . . Thus newly discovered evidence that is cumulative of evidence admitted at the trial tends to carry less weight than new evidence that is different in kind. . . . Moreover, the judge must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial. . . .  The motion

judge decides not whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury's deliberations. . . .  This process of judicial analysis requires a thorough knowledge of the trial proceedings . . . and can, of course, be aided by a trial judge's observation of events at trial. . . .

"Not only must the allegedly new evidence demonstrate the materiality, weight, and significance that we have described, but it must also have been unknown to the defendant or his counsel and not reasonably discoverable by them at the time of trial (or at the time of the presentation of an earlier motion for a new trial) . . . . The defendant has the burden of proving that reasonable pretrial diligence would not have uncovered the evidence." (Citations omitted.)

Grace, supra at 305-306.

"In reviewing the denial or grant of a new trial motion, we 'examine the motion judge's conclusion only to determine whether there has been a significant error of law or other abuse of discretion.'"  Weichell, supra at 799, quoting Grace, supra at 307.  "If the motion judge did not preside at the trial, we defer only to the judge's credibility determinations and 'regard ourselves in as good a position as the motion judge to assess the trial record.'"  Weichell, supra, quoting Grace, supra.

Here, we assume without deciding that the newly discovered evidence proffered by the defendant was actually newly discovered.  We thus review to determine whether the defendant's newly discovered evidence "casts real doubt on the justice of the conviction" or, said another way, creates "a substantial

risk that the jury would have reached a different conclusion had the evidence been admitted at trial."[28]  Grace, supra at 305-306.

To determine whether there is a substantial risk that the jury would have reached a different conclusion had the newly discovered evidence been admitted at trial, we must examine the evidence in the defendant's offer of proof that the jury did not hear and consider, and decide not only whether it is material and credible, but whether it is admissible.  Commonwealth v. Weichell, supra at 798-799, and cases cited.  Id. at 799 (defendant "bears the burden of demonstrating that any newly discovered evidence is admissible").  In this respect, our review differs from the examination of actual innocence conducted by the District Court judge, where she was permitted to consider inadmissible evidence.  See note 18, supra.

We set forth below the pertinent evidence that the jury did not hear that the defendant contends casts real doubt on the justice of the conviction.  To evaluate the newly discovered evidence, we determine whether this additional evidence would be

---

[28] "A substantial risk of a miscarriage of justice exists when we have 'a serious doubt whether the result of the trial might have been different had the error not been made.'" Commonwealth v. Randolph, 438 Mass. at 297, quoting Commonwealth v. Azar, 435 Mass. 675, 687 (2002).  "Errors of this magnitude are extraordinary events and relief is seldom granted." Randolph, supra, citing Commonwealth v. Amirault, 424 Mass. 618, 646-647 (1997).  "In analyzing a claim under the substantial risk standard, '[w]e review the evidence and the case as a whole.'" Randolph, supra, quoting Commonwealth v. Azar, supra.

admissible and whether, in view of the evidence actually
admitted at trial, it would cast real doubt on the justice of
the conviction in the minds of a reasonable jury.

a. Rivera's Federal District Court testimony. Rivera has
died, but we assume without deciding that her unavailability
would not preclude the admission of the testimony she gave in
the Federal District Court. We also assume without deciding
that her testimony regarding what she heard Smalls say and what
she saw Smalls do would be admissible as third-party culprit
evidence.[29] In addition, we give weight to the Federal District

---

[29] The well-established principles governing the
admissibility of third-party culprit evidence are set forth in
Commonwealth v. Silva-Santiago, 453 Mass. 782, 800-801 (2009):

"Third-party culprit evidence is 'a time honored
method of defending against a criminal charge.' 'A
defendant may introduce evidence that tends to show that
another person committed the crime or had the motive,
intent, and opportunity to commit it.' . . . We have given
wide latitude to the admission of relevant evidence that a
person other than the defendant may have committed the
crime charged. 'If the evidence is "of substantial
probative value, and will not tend to prejudice or confuse,
all doubt should be resolved in favor of admissibility."'
. . . Yet, this latitude is not unbounded. The
limitations are twofold. First, because the evidence is
offered for the truth of the matter asserted -- that a
third party is the true culprit -- we have permitted
hearsay evidence that does not fall within a hearsay
exception only if, in the judge's discretion, 'the evidence
is otherwise relevant, will not tend to prejudice or
confuse the jury, and there are other "substantial
connecting links" to the crime.' . . . Second, the
evidence, even if it is not hearsay, 'must have a rational
tendency to prove the issue the defense raises, and the
evidence cannot be too remote or speculative.' . . . Each

Court judge's finding that Rivera was a credible witness, although we are not required to do so.[30]  Therefore, we assume that a reasonable jury would credit Rivera's testimony that, sometime after the defendant's conviction, Smalls, after he had been drinking and used cocaine, drove Rivera to a wooded area in Springfield, and, while attempting to force himself upon her, told her to "stay still" or he would kill her just like he had killed the victim.[31]  We also assume that a reasonable jury would credit Rivera's testimony that Smalls had told her that the victim was his "first love," that the victim had introduced him to sex, that he had posted nude photographs of the victim in his bedroom, and that he had told her that the victim was "mine and only mine."

We conclude that some of Rivera's Federal District Court testimony would not be admissible.  Her lay opinion that Smalls

_____

of these limitations recognizes that the admission of feeble third-party culprit evidence poses a risk of unfair prejudice to the Commonwealth, because it inevitably diverts jurors' attention away from the defendant on trial and onto the third party, and essentially requires the Commonwealth to prove beyond a reasonable doubt that the third-party culprit did not commit the crime."  (Citations omitted; emphasis added.)

[30] The defendant concedes that no State court judge would be bound to credit Rivera's Federal District Court testimony.

[31] Similarly, we assume a jury would credit Rivera's testimony that, when she asked, "So you're the one [who] killed [the victim]?" the defendant responded, "Yeah, but nobody's going to find out."

had an evil streak and was obsessed with the victim is not admissible.  See Commonwealth v. Martin, 417 Mass. 187, 190 (1994) (testimony not based in fact is irrelevant and inadmissible); Commonwealth v. Wolcott, 28 Mass. App. Ct. 200, 207 (1990) (lay witnesses are to confine testimony to what they personally have observed).  Evidence of Smalls's history of abuse towards Rivera (except the incident of abuse where he purportedly admitted to the killing) is also not admissible, because we do not admit character or propensity evidence where it is meant to be used to infer that, because Smalls abused Rivera, he probably killed the victim.[32]  See Commonwealth v. Tobin, 392 Mass. 604, 613 (1984), quoting Commonwealth v. Chalifoux, 362 Mass. 811, 815-816 (1973).

b.  Britt's prior testimony.  We also assume without deciding that Britt's prior testimony regarding what Rivera told her about Smalls's alleged admissions would be admissible.  We recognize that the trial court judge expressly discredited Britt's testimony when he denied the defendant's first new trial motion, but we also recognize that the judge did not have the

---

[32] We reject the defendant's assertion that Smalls's alleged hitting of Rivera, including banging a door against her, can be likened to repeatedly stabbing someone so as to constitute admissible "modus operandi" evidence.  See Commonwealth v. Jackson, 428 Mass. 455, 459 (1998).  Cf. Commonwealth v. Pimental, 454 Mass. 475, 479 (2009) (assault committed with knife does not share striking resemblance to assault committed with shod foot).

benefit of hearing Rivera's testimony, which corroborated that part of Britt's testimony where she related what Rivera had told her. This assumption would make admissible Britt's testimony that Rivera told Britt about the admissions Smalls made when he sexually assaulted Rivera, that Smalls denied killing the victim but admitted that he had told Rivera he had killed the victim in order "to scare her," and that Rivera had told Britt that she thought Smalls was "only trying to scare her."

We also assume without deciding that Britt's testimony that Smalls told her that he had broken a window to gain entry to the victim's apartment and had taken various items would be admissible, but we give no probative weight to this testimony. There was no evidence of any forced entry into the apartment when the victim's body was discovered, and no corroborating evidence of any subsequent break-in. Even assuming its truth, it does not suggest that Smalls killed the victim. Rather, it could suggest that, where she previously had been his girl friend, she had some property (perhaps belonging to him) that he wanted to retrieve following her death; that where she had been his first love, he had wanted something by which to remember her; or that he took the items to sell to support his drug addiction.

We conclude that some of Britt's testimony would not be admissible. Britt's testimony as to what her husband said was

the time that Smalls arrived home on the morning of May 14 constitutes classic "totem pole" or "layered" hearsay.  See Commonwealth v. Caillot, 449 Mass. 712, 721 (2007).  "[E]vidence based on a chain of statements is admissible only if each out-of-court assertion falls within an exception to the hearsay rule."  Commonwealth v. McDonough, 400 Mass. 639, 643 n.8 (1987), citing Bouchie v. Murray, 376 Mass. 524, 527-531 (1978).  Britt's husband's statement that Smalls arrived home at 3:30 A.M. does not fall into any hearsay exception.  Even if admitted, it would not inculpate Smalls (and therefore exculpate the defendant).  At trial, a neighbor of the victim testified that, shortly before 4 A.M., he heard a woman's screams, and then heard an automobile leave the area.  Therefore, if Smalls truly came home at 3:30 A.M., and if the killer drove away in an automobile rather than a moped, Smalls was not likely the killer.

c.  Harris's testimony.  We agree with the trial judge who decided the defendant's first new trial motion that Harris's testimony that Smalls attempted to sell a hunting knife to her boy friend on or around the day of the killing was "inconsequential."  Harris was unsure of the precise date of the attempted sale, but even if it were the day of the killing, it makes no sense that, if Smalls were the killer, he would dispose of the murder weapon by selling it to his sister's boy friend.

Significantly, there was no evidence that linked this knife to the killing. The presence of blood on a hunting knife is not relevant where there was no evidence as to whose blood was on the knife, or even whether it was human blood.

d. Analysis regarding substantial risk of a miscarriage of justice. Conducting our analysis of the newly discovered evidence in the light most favorable to the defendant, we shall also consider evidence that was not newly discovered, including the content of Smalls's May 14 police statement, because it was available but not offered at trial: that the victim told Smalls when she left that she was going home to "fuck" the defendant and Smalls replied, "Don't go home because I'll be there when you get there." The totality of this evidence permits a reasonable inference that Smalls had a motive to kill the victim, because he was not over his relationship with her and she was leaving to have sex with another man. It also permits a reasonable inference that, after the defendant's conviction, Smalls told Rivera, while he was sexually assaulting her, that he wanted her to stay still or he would kill her like he killed the victim. We consider now the evidentiary weight that reasonably should be given to these permissible inferences.

The more closely one examines Smalls's motive to kill, the less compelling it appears. Evidence of a third party's ill will or possible motive is insufficient alone to support a

defense under the third-party culprit doctrine.  See

Commonwealth v. Mandeville, 386 Mass. 393, 398 (1982).  Smalls

declared in his police statement that he had broken up with the

victim nearly two years before she was killed, and he knew her

then boy friend, whom he considered a friend.  Because he knew

that she had a boy friend, he must have known she was having

sexual relations with another man, so it would not have been a

revelation to him that she planned to do so that night.  See

Commonwealth v. Bizanowicz, 459 Mass. 400, 418-419 (2011)

(hearsay statements about victim's alleged romance with third

party and police report about third party's dispute with former

tenant did not show "substantial connecting link" between third

party and victim's murder and therefore were inadmissible).

Moreover, it was Smalls who informed the police that he had told

the victim that she should not go home because he would be there

when she got home; it is doubtful he would have told the police

about this statement if he perceived it to be incriminating.

We accept for purposes of our analysis that Rivera was

credible when she stated that Smalls told her that he had killed

the victim, but that does not mean that Smalls's admission was

credible.  Smalls had been drinking and had ingested cocaine

before making the statement.  Although Rivera in her Federal

District Court testimony spoke as if she thought that Smalls had

actually killed the victim, she told Britt when she first

related the event to her that Smalls was "only trying to scare her."  Smalls said the same thing to his mother when he acknowledged having made those statements to Rivera.  This was not a confession intended to purge one's feelings of guilt or share a secret with a trusted friend; this was a statement that was intended to intimidate Rivera so that she would stay still and submit to his sexual assault, and it appeared to have served its intended purpose.

Having considered the evidentiary weight of the newly discovered evidence, we now compare it with the evidentiary weight of the evidence against the defendant that was offered at trial.  The defendant was the last person seen with the victim at approximately 12:45 $\underline{A}$.$\underline{M}$., and he was seen with her at the apartment where she was killed.  Although the medical examiner opined that she was killed between 12:15 $\underline{A}$.$\underline{M}$. and 6:15 $\underline{A}$.$\underline{M}$., there was strong evidence that she was killed at approximately 4 $\underline{A}$.$\underline{M}$. when the victim's neighbor heard a woman's screams and then heard an automobile, not a moped, leave the area outside the victim's apartment shortly thereafter.

The defendant's statement to police in Delaware approximately one hour after his arrest was incriminating.  It was, in fact, so incriminating, that the defendant denied making any such statement when he testified at trial.  In the statement, the defendant said that he picked up the victim at

the bar at approximately 10 P.M., they retrieved the baby from her mother's house, and then he drank and had sex with the victim in her apartment before leaving at approximately 1 A.M., when the victim was sleeping.[33] If he and the victim had arrived at 12:45 A.M., as one neighbor testified, it is not likely that, in just fifteen minutes, the victim's baby was put to bed, they drank and had sex, and the victim fell asleep. It is far more likely that the time devoted to these events would place the defendant at the victim's apartment when her screams were heard at 4 A.M. It is noteworthy that, when he testified at trial, and knew that a neighbor had seen him entering the victim's apartment with her at 12:45 A.M., he changed his story, and claimed that he had sex with the victim in the back seat of the automobile before he entered the apartment, and merely spoke with the victim in her apartment for approximately one hour before he left between 1 and 1:30 A.M. It is far more likely that they had sex in the apartment rather than in the back seat of the automobile, because they had a baby in the automobile with them and were headed to her apartment. The location of the defendant's sex with the victim is important for more than the time line; there was no evidence of forced entry into the victim's apartment, and the evidence that the victim had been

---

[33] At trial, the defendant testified that the victim was awake and let him out when he left her apartment.

found with her hands bound (with a ribbon) suggested some type of consensual sexual act had occurred inside her apartment, and not inside an automobile, shortly before she was stabbed.

Second, in his statement to the police in Delaware, the defendant described the victim as a "whore" who was "on tic." Turner testified that, in the telephone call during which the defendant confessed to her murder, the defendant referred to the victim as "a white bitch" who was "on tic." The defendant's use of the distinct phrase "on tic" at the police interview corroborates Turner's testimony regarding the defendant's confession. Also corroborative of Turner's testimony is the defendant's denial that he had made any telephone calls from his sister's home in Delaware, where telephone records from that location reveal a four-minute call to Turner's aunt, who testified that the defendant had telephoned her and had asked her for Turner's telephone number. The thirty-six-minute telephone call from that location to Turner's home commenced twenty-one minutes after the termination of the defendant's telephone call to Turner's aunt. Moreover, although there was evidence that Turner disliked the defendant, there was no persuasive reason argued at trial as to why Turner would fabricate the defendant's confession to murder. Turner's so-called recantation of his identification of the defendant as the person who made the telephone call confession reasonably could

have been discredited by a jury, particularly where it had occurred after Turner's mother had "made up" with the defendant.

Although the footprint evidence from the defendant's sneaker was of marginal probative relevance, the blood evidence was powerful. The significance of the defendant's presence in Archie's automobile while he was bleeding from a physical assault seven days before the killing was undermined by the fact that Archie had been the one driving that night. Thus, the presence of occult blood on the steering wheel area of Archie's automobile and on the headlight switch was powerful. Also suggestive of the presence of blood on the defendant on the morning of the killing was Archie's observation that the defendant had changed his pants, but not his shirt, when he arrived that morning with Archie's automobile.

Having carefully considered the admissible evidence that the jury did not hear, and the evidence that they did, we conclude that, in light of the strength of the evidence against the defendant at trial and the meager probative weight of the newly discovered evidence, the new evidence does not cast real doubt on the justice of the defendant's conviction because there is not a substantial risk that the jury would have reached a different conclusion had this evidence been admitted at trial. We therefore affirm the motion judge's denial of the defendant's fifth motion for new trial.

<u>Order denying motion for a
new trial affirmed</u>.